ALASKA USA FEDERAL CREDIT
UNION, Appellant,

v.

Valgerdur FRIDRIKSSON, Alaska State
Commission for Human
Rights, Appellees.

No. 5230.

Supreme Court of Alaska.

March 26, 1982.

Paul J. Nangle, Nangle & Clark and Steven P. Oliver, Anchorage, for appellant.

Carolyn E. Jones, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellees.

OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and COOKE, Superior Court Judge.*

MATTHEWS, Justice.

Valgerdur Fridriksson, a female employee of the Alaska USA Federal Credit Union ["Alaska USA"] in Adak, applied in October of 1975 for the position of branch manager of the Adak office. She was not promoted; a male applicant was hired instead. Fridriksson then filed a complaint with the Alaska State Commission for Human Rights, alleging sex discrimination in violation of AS 18.80.220(a)(1).[1] The Commission ruled in her favor. Alaska USA appealed to the superior court, which affirmed the Commission's ruling.

Fridriksson began working as a teller for the two-person Alaska USA office in Adak in June, 1975. Her prior experience included nineteen months as a teller for the National Bank of Iceland from 1963 to 1965, and one year in that bank's savings and loan department from 1961 to 1962. She had not worked during the ten years between 1965 and 1975. Four months after Fridriksson began work in Adak, the branch manager quit. Fridriksson applied for the position, and was recommended for it by the outgoing manager. Leo Fancher, a senior loan officer of Alaska USA came to Adak to evaluate the office's operations and told Fridriksson that he would tell Anchorage that he had picked her as manager.

Fancher's authority did not include the hiring of branch managers. That authority in 1975 was vested in Alaska USA's general manager, who had delegated it to his assistant, William Eckhardt. Fridriksson was not hired.

In December, 1975, Fridriksson filed her complaint with the Commission. Alaska USA challenged the Commission's jurisdiction, on the ground that Alaska USA, as a nonprofit credit union, was exempt from the coverage of the Human Rights Act. The Commission's hearing examiner, however, rejected this challenge. Testimony was taken in June, 1977, in Adak and Anchorage. The hearing examiner issued his recommended decision in December. He concluded that Fridriksson had been denied promotion on account of her sex. The Commission essentially adopted the hearing examiner's opinion as its decision in May, 1978.

Alaska USA then appealed the Commission's decision to the superior court in Anchorage. In February, 1980, the court up-

---

* Cooke, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. AS 18.80.220(a)(1) provides:
   *Unlawful employment practices* (a) It is unlawful for
   (1) an employer to refuse employment to a person, or to bar him from employment, or to discriminate against him in compensation or in term, condition, or privilege of employ-

ment because of his race, religion, color or national origin, or because of his age, physical handicap, sex, marital status, changes in marital status, pregnancy or parenthood when the reasonable demands of the position do not require distinction on the basis of age, physical handicap, sex, marital status, changes in marital status, pregnancy or parenthood;

held the Commission on all points relevant to this appeal. Alaska USA has appealed again.

The issues for review are whether the Commission had jurisdiction over Alaska USA; if so, whether the Commission correctly found that Alaska USA's failure to promote Fridriksson constituted illegal sex discrimination; if so, whether the Commission correctly assessed the damages due Fridriksson.

## I. JURISDICTION

Alaska USA first reasserts its contention that the Commission was without jurisdiction over it. AS 18.80.220(a)(1) makes it illegal for an "employer" to engage in sex discrimination in employment practices. "Employer" is defined in AS 18.80.300(3) as *excluding* "a club that is exclusively social, or a fraternal, charitable, educational, or religious association or a corporation, if the club, association or corporation is not organized for private profit." Alaska USA argues that it falls within this exemption, since it is nonprofit and fraternal, its membership being limited to certain defined groups. Membership in the credit union is open to military and civilian personnel at Elmendorf, Adak and Shemya military bases, members of the Air National Guard, senior members of the Civil Air Patrol, shareholders in ten Native regional corporations, and employees of certain contractors of Alyeska Pipeline Service Company.

The Commission concluded, among other things, that Alaska USA was not a fraternal association stating:

A review of those groups actually eligible to participate in the Alaska USA Federal Credit Union reveals no commonality of interest other than employment or physical presence in Alaska. While the chartering authority may have found this to be a sufficiently "well defined neighborhood, community or rural district" for membership purposes under the federal law for credit unions [12 USCA 1759], it could hardly be called a fraternal organi-

zation under any reasonable construction of that term.

■■■ We agree with this reasoning. We also observe that, "[c]redit unions, however, useful they may be, exist for purely mercantile purposes and although they may be organized on a non-profit basis, members join credit unions in search of profits on their investments." *Quijano v. University Federal Credit Union*, 617 F.2d 129, 133 (5th Cir. 1980). This construction is also consistent with the view, often expressed by this court, that Alaska's civil rights statute should be broadly construed "to further the goal of eradication of discrimination." *Wondzell v. Alaska Wood Products, Inc.*, 601 P.2d 584, 585 (Alaska 1979) (opinion on rehearing); *see McLean v. State*, 583 P.2d 867, 869 (Alaska 1978); *Hotel Employees Local 879 v. Thomas*, 551 P.2d 942, 946–47 (Alaska 1976); *Loomis Electronic Protection, Inc. v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976).

## II. THE CLAIM OF SEX DISCRIMINATION

### A. The Prima Facie Case

The Commission found that Fridriksson had established the four elements of a *prima facie* case of sex discrimination set out by the United States Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973):[2]

(1) that she is a member of a protected class (women);

(2) that she applied for and was qualified for the vacant branch manager position;

(3) that she was rejected despite her qualifications; and

(4) that the position remained open and Alaska USA continued to seek applicants.

Alaska USA takes issue with the finding of the Commission that Fridriksson was qualified for the branch manager position in Adak. It argues that one qualification for the branch manager position was that

---

2. This court adopted the *McDonnell-Douglas prima facie* test in a sex discrimination case, *Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487 (Alaska 1980).

the applicant have previous management experience or education, and Fridriksson did not fulfill this requirement.

■ We believe that the Commission's finding was not clearly erroneous. The qualifications component of the *McDonnell-Douglas* test can only be sensibly applied if the qualifications to which it refers are objective ones which have actually been established for the position in question. Mat-

3. The fact that one applicant might be better qualified than the claimant does not mean that the claimant has not made a prima facie case. It seems more sensible to require the employer, in his rebuttal to the complainant's case, to offer his justification for his employment decision, rather than to force the complainant to refute hypothetical reasons why the employer might have found him relatively less qualified. Establishment of a prima facie case under the *McDonnell* standard does not constitute an ultimate finding of fact as a discriminatory refusal to hire. . . .; *Furnco [Construction Corp. v. Waters]*, 438 U.S. [567] at 576 [98 S.Ct. 2943, 2949, 57 L.Ed.2d 957]; *McDonnell* is merely a model for ordering and evaluating evidence concerning employment discrimination. The employer can offer his rationale for refusing to hire or for firing the complainant in the second step of the *McDonnell* model.

   *Davis v. Weidner*, 596 F.2d 726, 730 (7th Cir. 1979). *See Davis v. Califano*, 613 F.2d 957, 964 (D.C.Cir.1980); *Rogillio v. Diamond Shamrock Chemical Co.*, 446 F.Supp. 423, 426–27, 429 (S.D.Tex.1977).

4. William Eckhardt, the Credit Union's assistant general manager, was asked and answered as follows concerning the qualifications for branch manager.

   Q. What are the qualifications for jobs as branch managers at various branches of the credit union?
   A. I don't understand the question?
   Q. What qualifications are required for the job of branch manager at Adak?
   A. Well, there's no hard cast qualifications. We try to find the—the—you know, the best person that we can for the job as far as, you know, experience, their education, ability to work with people; certainly someone that's supervised people, administrative type, we'd look for; and, as I've stated in—in a number of the letters, retainability, because it is costly to—to train people and have 'em, you know, move in and out of particularly the Adak branch, and that's—We have an informal agreement with each branch manager that they will stay in the area a minimum of two years.
   Q. So, what are the minimum qualifications that you look for?

ters of mere preference between competing applicants are best left to the employer's case in rebuttal.[3] Such objective qualifications might include specific educational or experience criteria or that the applicant be the holder of a special certificate or license. In the present case the only objective qualification which was testified to was the requirement of a high school education. Other than that Alaska USA simply tried to find the best person it could for the job.[4]

   A. I just stated them.
   Q. So, they must have some education. How much education?
   A. Oh, granted. Well, okay, they would have to have a high school education.
   Q. High school education, okay. And what sort of experience?
   A. Well, there's no particular experience levels like you qualify like a high school—you know, where they would have to have a finance background or—But any experience in any of the areas I've just outlined would be favorable to an applicant.
   Q. Well, would—For example, would experience as a—a salesman or a sales representative qualify for the position?
   A. Depending on what they sold and who they worked for—it could.
   Q. Well, then how do you know when you have to choose between two people which person that you are going to hire?
   A. How do I know?
   Q. Yes.
   A. Well, through interviews and through just an evaluation of their experience, their education, and, you know, my opinion of—of the person.
   Q. And so what is given the most weight?
   A. Well, it's different in every situation. I can't qualify that—
   Q. Okay. But you'd say your—
   A. —that rigidly.
   Q. —opinion of the person?
   A. If I just—If someone were to come into the office and, you know—it's very difficult in personnel management, but to—if someone were to come into the office and were, you know, very—an introvert and couldn't deal with people and this sort of thing, you know, I wouldn't look favorably upon that person as an applicant.
   Q. So, would you rely on your own subjective feelings as far as that—as far as that person?
   A. Yes.
   Q. Okay.
   A. That's what the interview process is for.
   Q. Would you say that's the most important consideration?
   A. It could be. It could be. I can't say in every case it is, but—

Since Fridriksson had a high school education, the Commission did not err in concluding that she met the qualifications component of the *McDonnell* test. This conclusion is further supported by the fact that the prior branch manager at Adak, as well as Leo Fancher, the senior loan officer sent to Adak when the outgoing manager terminated, both indicated that Fridriksson was qualified for the branch manager position.

### B. *Explanations Offered by Alaska USA*

■ Once a prima facie case of discrimination is made, it becomes incumbent on the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."[5] *McDonnell-Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. If the employer does this, the employee then has the opportunity to demonstrate that this reason is not the true reason for the employer's decision. "She may succeed in this either directly by persuading [the trier of fact] that a discriminatory reason more likely than not motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207, 217 (1981).

In the present case Alaska USA argued that its refusal to promote Fridriksson was based on the following grounds: 1) that Fridriksson would not commit herself to staying in Adak for a two-year period; 2) that Fridriksson's five person family was too large to occupy the credit union's two bedroom trailer at Adak; 3) that it would be too costly to train Fridriksson; and 4) that Fridriksson did not have substantial business management training or experience.

> Q. But your subjective feeling is very important?
> A. Yes, it's very important.

**5.** The articulation must be based on admitted evidence; the employer may not rely solely on his answer to the complaint, or on arguments

■ The Commission found, in essence, that these explanations were unworthy of belief, and that Fridriksson's "sex was a factor in the decision not to promote her." This is a determination of fact and as such it must be allowed to stand if it is supported by substantial evidence.[6] Such support does exist in this record.

■ The Commission determined that Fridriksson's application was not taken seriously by the credit union, noting that "[i]t does not appear that [her] qualifications were compared with those of other applicants for the position." The testimony of Eckhardt, who made the hiring decision, bears out the fact that he made no such comparison.

The Commission found "that the employer made a number of assumptions about the cost of training, the ability to supervise, the complainant's rotation date, the adequacy of housing that it would not and did not make with male applicants." These findings are also supported by the evidence.

For example, with respect to housing, Alaska USA simply assumed that Fridriksson's family would not wish to live in the trailer which it furnished for branch managers in Adak. It never asked whether this was so and never sought to explore alternative uses for the trailer which would have protected its interests in the event Fridriksson did not desire to move.

With respect to Fridriksson's rotation date, Alaska USA assumed that Fridriksson could not give the two year commitment it desired because she had written "undecided" opposite the words "rotation date" on her application for a clerical position with the credit union some months before. "Undecided" could mean any period of time, but the credit union never requested a clarification. Fridriksson testified that the indecision to which she referred was whether she and her family would stay in Adak for a

of counsel. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207, 216 (1981).

**6.** *Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487, 490 (Alaska 1980).

period as short as five years or as long as ten. Alan Andrews who was hired as branch manager instead of Frikriksson left the rotation date space blank in his application.

A central feature of Eckhardt's testimony was an explanation of the costs which would have been involved in training Fridriksson. This testimony was substantially impeached on cross examination, by demonstrating that the credit union did not hesitate to incur similar costs where the new manager was to be a man.

With respect to Alaska USA's contention that Fridriksson lacked substantial management training or experience, Eckhardt never compared Fridriksson's qualifications with those of the successful applicant, Andrews, either in making the hiring decision, or in explaining it to the hearing officer. Nor was such a comparison offered in other testimony. There was thus no compelling evidence that Andrews was a preferable candidate to Fridriksson.

In summary, we are unable to say that the Commission's determination that Fridriksson's sex was a factor in her failure to gain the promotion is without substantial evidentiary support. That determination must therefore be affirmed.[7]

### III. DAMAGES

■ Alaska USA's final point on appeal is that the Commission erred in ruling that Fridriksson was entitled to an award of $300.00 per month representing the fair rental value of the credit union's house trailer which it furnished free of charge to its Adak branch manager. We agree. There was no evidence that if Fridriksson had been promoted to the position of branch manager she would have been willing to utilize the trailer furnished by the credit union without building an addition to it. The credit union had no duty to allow such an addition to be built. Assuming that she would not have used the trailer, it likewise was not established that she would have been entitled to an additional salary representing the fair rental value of the trailer. Therefore, because this portion of the Commission's award was not supported by the evidence it must be eliminated.

AFFIRMED in part, REVERSED in part, and REMANDED for recalculation of the amount due.

RABINOWITZ, C. J., concurs.

CONNOR, J., dissents.

COMPTON, J., not participating.

RABINOWITZ, Chief Justice, concurring.

I agree that the Commission's and the superior court's rulings should be sustained on appeal. I am unable to conclude, however, that Fridriksson need not have proven intentional discrimination to prevail.[1] When a woman alleges that gender was a factor in an employer's hiring decision, an indispensable requisite of her claim is that the employer willfully discriminated. Absent proof of a discriminatory motive or of facts from which such a motive can be inferred, a woman's claim of discriminatory treatment must be rejected.[2]

In this case we are faced with a situation in which the Commission's findings on the

---

7. The Commission's finding that the credit union's actions were not "intentionally and willfully discriminatory" is not inconsistent with its conclusion that the credit union had discriminated against Fridricksson because of her sex. Discrimination need not be purposeful to be unlawful under AS 18.80.220(a)(1). Instead, unlawful discrimination may result, as Mr. Justice Stevens has observed in a different context, as an "accidental byproduct of a traditional way of thinking about females." *Califano v. Goldfarb*, 430 U.S. 199, 223, 97 S.Ct. 1021, 1035, 51 L.Ed.2d 270, 286 (1977) (Stevens, J., concurring in judgment).

1. *See* note 7 *ante.*

2. Since we have relied on federal Title VII cases for guidance in interpreting Alaska's anti-discrimination statutes, *see Alaska State Comm'n for Hum. Rts. v. Yellow Cab*, 611 P.2d 487, 489–92 (Alaska 1980), federal precedent discussing the requirement of proof of discriminatory motive is instructive here. As the Supreme Court observed in *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

   "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. *Proof of discrimina-*

crucial issue of discriminatory intent appear to be inconsistent. On one hand, the Commission found that Fridriksson had established a prima facie case of discriminatory treatment and that the prima facie case was unrebutted by the credit union; on the other hand, the Commission noted that the credit union had not "intentionally and willfully" discriminated.[3] Notwithstanding this apparent inconsistency I believe that the majority is correct in concluding that Fridriksson's claim of discriminatory treatment is well-founded because the requisite proof of discriminatory motive is supplied by Fridriksson's unrebutted prima facie case of discrimination. The Commission's findings of fact establish the existence of a prima facie case of discrimination, and

*tory motive is critical,* although it can in some situations be inferred from the mere fact of differences in treatment.
*Id.* at 335 n.15, 97 S.Ct. at 1854 n.15, 52 L.Ed.2d at 415 n.15 (emphasis supplied). I agree that employers' personnel decisions may often be the product of preconceived notions about the role of gender in the marketplace rather than of a bad faith, purposeful design to place women at a disadvantage. To the extent that the majority takes the position that an aggrieved woman need not demonstrate that an employer's decision was made in bad faith, I align myself with the majority. A basic purpose of Alaska's antidiscrimination legislation is to eradicate the barriers created by gratuitous, stereotyped assumptions about the suitability of women as employees. Insofar as the majority holds that a woman charging discriminatory treatment need not demonstrate that gender was a factor in an employer's personnel decision, however, I cannot agree with the majority.

3. The Commission erroneously concluded that a showing of intentional discrimination was not necessary in order to find for Fridriksson. To reach this conclusion the Commission justifiably relied on federal Title VII precedent, but failed to distinguish between federal cases dealing with the disparate treatment theory of discrimination, which requires proof of discriminatory motive, and cases applying the disparate impact theory, under which proof of discriminatory motive is not necessary.

In a disparate impact case the employer's motives are irrelevant. The gravamen of a claim under this theory is that a facially neutral hiring criterion—e.g., passing a particular test or meeting minimum height or weight requirements—has a disproportionate impact on a protected class of persons in that the criterion tends to exclude the majority of the persons in

those findings are supported by substantial evidence. Similarly, the Commission's finding that the credit union's proffered justifications for its hiring decision lacked credibility is adequately supported by the record. The legal conclusion that follows from an unrebutted prima facie case is that gender was a factor in the employer's hiring decision. To the extent that the Commission concluded that the credit union's actions were not intentionally discriminatory, that finding is at odds with the legally sufficient inference of discrimination supplied by the prima facie case, and the finding must be rejected as without support in the record.

CONNOR, Justice, dissenting.

I must respectfully dissent.

that class from eligibility. An aggrieved person challenging the propriety of an exclusionary hiring criterion need only show that the criterion has a disparate impact on a protected class; he need not further demonstrate that the criterion was designed to be discriminatory:

[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability.

*Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971). *See also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), a later disparate impact case relied on by the Commission as support for the proposition that proof of discriminatory motive was not a necessary element of Fridriksson's case. The Supreme Court's disparate impact jurisprudence is not, however, applicable to a disparate treatment case such as the one at hand. As the Court has explained:

Proof of discriminatory motive is critical [in a disparate treatment case], although it can in some situations be inferred from the mere fact of differences in treatment....

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.... Proof of discriminatory motive, we have held, is not required under a disparate impact theory.

*International Bhd. of Teamsters v. United States*, 431 U.S. at 335 n.15, 97 S.Ct. at 1854 n.15, 52 L.Ed.2d at 415 n.15 (citations omitted).

First, I do not believe that the complainant presented a prima facie case of sex discrimination. Second, even if a prima facie case was presented, it appears that the employer did "articulate some legitimate, nondiscriminatory reason for the employee's rejection," *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 668, 678 (1973), and that the employer's reasons for rejecting the complainant were not merely a pretext for discrimination.

The reasons given by Mr. Eckhardt, who made the hiring decision, were that Fridrikkson had no background in supervision or management, that until she started with Alaska USA she had not worked for ten years, her rotation date was undecided, and that it would be too costly to train her. But her lack of experience was the main factor in not hiring her. By contrast, Alan Andrews, who was hired as the manager, had completed numerous college courses in business administration and had worked in the business world, albeit in sales positions.

One who makes the hiring decision for a managerial position of this sort must weigh various intangible factors and arrive at an overall conclusion, based upon the data available. From my reading of the record it does not appear that the preferment of Andrews over Fridriksson was for any prohibited reason. Moreover, it appears to me that one in Mr. Eckhardt's position might well have concluded rationally, on grounds other than sex difference, that Andrews was better qualified. Plainly and simply, the decision was merely the exercise of management prerogative, a sphere of action into which the law, even in its desire to prevent discrimination, has no business intruding.[1]

Additionally, the record shows that at the time that Fridriksson applied for this position Alaska USA controlled four full service branches. One of those branches, at Fairbanks, was managed by a woman. Moreover, the credit union had been expanding over a period of years. By the time of the Commission hearing in this case the credit union had hired 12 females and 20 males as managers at 11 of its branches. The Commission seems to have given no weight to those factors, although they might explain why the Commission made a finding that the credit union's actions were not intentionally and willfully discriminatory.

In my opinion the circumstances of this case do not give rise to an inference of unlawful discrimination. The statute at issue here should not be construed to diminish traditional management prerogatives, and it does not require that an employer give preferential treatment to minorities or females. *Steelworkers v. Weber*, 443 U.S. 193, 205–07, 99 S.Ct. 2721, 2728–29, 61 L.Ed.2d 480, 490–91 (1979). Thus I would reverse the superior court and the determination of the Commission.

---

1. It is not for courts or the Human Rights Commission to pass upon the business judgment of the employer, even though that judgment may seem poor or erroneous to others. An employer may articulate nondiscriminatory reasons for his actions even though those reasons would not be approved if a court were making the decision. The ultimate focus must be on whether the employer acted with discriminatory motivation, not on whether his business judgment is sound. See *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012, n.6 (1st Cir. 1979).