**Bambi (Relkin) MULLER and Lowell Relkin, Plaintiffs,**

v.

**BP EXPLORATION (ALASKA) INC., Defendant.**

**No. S–7128.**

Supreme Court of Alaska.

Sept. 13, 1996.

Harry Relkin, Albuquerque, New Mexico, pro se.

Ben J. Esch, Garretson & Esch, Anchorage, for Plaintiffs.

Katherine C. Tank, Perkins Coie, Anchorage, for Defendant.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS, and EASTAUGH, JJ., and CARPENETI, J. Pro Tem.*

*OPINION*

EASTAUGH, Justice.

## I.  INTRODUCTION

We here consider the effect of the marital status anti-discrimination clause in AS 18.80.220(a)(1).  After an unmarried couple sued their former employer, the United States District Court for the District of Alaska certified to us the following two questions: whether AS 18.80.220(a)(1) prevents an employer from discriminating against an employee "based on the identity of his spouse," and whether AS 18.80.220(a)(1) is limited to preventing employers from discriminating based on the status of being married.  We answer these questions "no," and "yes," respectively.  Although AS 18.80.220(a)(1) prevents employers from discriminating based on the marital status of their employees, it does not prevent discrimination based on the identity of the employee's spouse or future spouse.

## II.  FACTS AND PROCEEDINGS

Bambi (Relkin) Muller and Lowell Relkin sued BP Exploration Alaska, Inc. (BP) in 1993 in the Alaska superior court, alleging

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

that BP had unlawfully discriminated against them in violation of AS 18.80.220(a)(1).[1] BP removed the case to the United States District Court for the District of Alaska on the basis of diversity of citizenship, and moved for summary judgment.

The district court granted summary judgment to BP on all claims, except plaintiffs' claim of "marital status" discrimination. Recognizing that there was no controlling Alaska decisional precedent, the district court certified the following questions to us pursuant to Alaska Appellate Rule 407(a):[2]

Does Alaska's marital discrimination law, [AS] 18.80.220, apply to prevent an employer from discriminating against an employee based on the identity of his spouse, or future spouse, or is the statute limited to preventing employers from discrimination based on the status of being married, or about to be married?

We agreed to answer these questions.

The district court found the following facts:

This case arose after Plaintiffs resigned from their respective jobs with British Petroleum ("BP"). Plaintiff Lowell Relkin ("Relkin") had been working at BP since 1985 as an A Tech Production Operator. A production technician or operator controls the production of oil "from the reservoir to the gathering centers and is responsible for all associated equipment and piping between those two points."

In the fall of 1989, BP implemented a program to train new production operators. The four-year program was designed to take someone with no experience in oil production and train them to become E, D, C, B, and, ultimately, an A Tech Production Operator. The training program was to commence with six months of basic training or classroom instruction, to be followed by rotations in the field on an assigned crew under production operator mentors. Relkin was selected to coordinate the new operator training program about November of 1989. This placement, which was a promotion, was meant to be temporary.

Bambi (Relkin) Muller ("Muller") was working for BP in an administrative capacity in Anchorage when she applied to become a trainee. The training program was a step up for Muller. In about February, 1990, Muller and nine others were chosen for the training program, and became known as E Tech Production Operator Trainees. At the time of the selection process, Relkin and Muller did not know each other.

In the spring of 1990, the classroom portion of the training program began. In November, Muller, along with four others, were assigned to the A shift during the day. Within two months of the beginning of the training program, Relkin and Muller began to develop a romantic relationship. Plaintiffs informed BP of the relationship. BP informed Plaintiffs that there was no problem with their relationship and that no policy existed forbidding such a relationship. Plaintiffs were informed, however, that if the relationship led to marriage, Relkin may have to step down as training coordinator.[1] The policy given to employees (employee handbook) stated that no discrimination based on marital status would exist. However, the supervisors['] manual contained BP's anti-nepotism poli-

---

1. Muller and Relkin were formally engaged at the time the cause of action arose. It is not clear whether they have since married. However, the issue of their subsequent marriage is not relevant to this discussion. We have held that the prohibition against discrimination on the basis of marital status protects the rights of unmarried couples. *Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d 1199, 1203 (Alaska 1989). Furthermore, the parties do not dispute that Muller and Relkin became engaged while they were employees at BP, nor do they dispute that BP's anti-nepotism policy applied equally to married and engaged personnel.

2. Appellate Rule 407(a) provides:

The supreme court may answer questions of law certified to it by the Supreme Court of the United States, a court of appeals of the United States, a United States district court, a United States bankruptcy court or United States bankruptcy appellate panel, when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state.

cy which prohibited married persons from supervising one another.

¹ BP's facts say that at this point Plaintiffs were informed of the BP policy which prohibits relatives from working together in a supervisor/supervisee relationship and that Relkin's supervisor informed him that the policy did not apply to Plaintiffs because they were not married. However Relkin was informed that if other trainees complained, Relkin could be forced to step down as training coordinator if investigation supported any claim of favoritism being given to Muller. Relkin denies that he was informed of the supervisor/supervisee prohibition.

Plaintiffs were engaged approximately four months later. In September of 1990, Relkin was allegedly informed that he would be removed as training coordinator because of the engagement. Additionally, Relkin, immediately following his removal as training coordinator, was placed temporarily on the night shift while Muller remained in classroom training on the day shift. Under normal shift rotations, Plaintiffs would have worked the same shift approximately fifty percent of the time. Relkin inquired into why he and Muller could not work the same shift. Relkin agreed to a demotion and a distant position as long as he and Muller could have the same hours. BP's Production Manager, Barney Dotson ("Dotson"), allegedly informed Plaintiffs that he would never allow them to work the same shift and if they kept asking, Relkin would be terminated. Relkin then allegedly learned from his immediate supervisor, Mel Pye ("Pye"), that the supervisors were threatened with termination if they allowed Plaintiffs to work the same twelve hour shift. Then, during meetings with the Human Resources Department management, Plaintiffs were allegedly told that BP management was "out to get" Plaintiffs.

On November 6, 1990, Plaintiffs entered BP's grievance process and grieved Relkin's demotion, management's decision not to allow them to work the same twelve hour shift, and discriminatory practices based on Plaintiffs['] personal relationship. At the first level, the grievance was decided against the Plaintiffs. Plaintiffs then continued the grievance to level II of V. Level II led to a grievance settlement.

The settlement provided that: (1) Relkin would step down as training coordinator; (2) a new rotation schedule would be created for the trainees which would allow, in three months, Relkin and Muller to be on the same twelve hour shift (the new schedule, like the old one, provided that changes could be made for operational reasons) and thereafter be treated as any other employee; (3) the grievance would be considered settled; and (4) upon a regular rotation, Relkin would be Muller's mentor.

Thereafter, the agreed rotation schedule went into effect. About two and a half months later, on February 24, 1991, BP informed the trainees and mentors that implementation of the second rotation, which was to begin four days later, would be delayed. BP says the reason for the delay was a shortage of mentors and a request by the trainees that the rotation be delayed until after they took an April exam. Plaintiffs hold that BP informed them personally that the settlement agreement would not be honored.

On the evening of February 23, 1991, Relkin reported to the medic with a stress related illness and was ordered to bed rest by BP medical staff. Relkin, on February 25, 1991, attended a letter of reprimand meeting in which he was presented with a letter of reprimand outlining deficiencies in Relkin's work, aptitude, and ability to get along with others. Relkin admitted to some of the facts in the letter but denied any wrongdoing. Relkin did not grieve the letter of reprimand. Relkin and Muller did not grieve the delay in implementing the rotation schedule.

At the end of the February 25, 1991, meeting, Relkin submitted his resignation. On the same day, Muller submitted her resignation. Shortly after the April exam, the agreed upon rotation schedule went into effect.

At oral argument before us, their counsel asserted that Muller and Relkin were co-employees, and that although initially Relkin was Muller's supervisor, ultimately neither was in a supervisory position over the other.

BP did not dispute that characterization of the facts.

## III. *DISCUSSION*

The meaning of the term "marital status" in AS 18.80.220(a)(1) presents an issue of first impression in Alaska. Muller and Relkin ask us to interpret the term "expansively," to prohibit employment discrimination based on the identity of one's spouse, not just on the condition of being married or unmarried. They argue that an expansive interpretation of "marital status" is suited to preventing the discriminatory practices contemplated by the Alaska legislature in enacting the Alaska Human Rights Act (AHRA). BP responds that elementary principles of statutory interpretation and considerations of public policy require that "marital status" be interpreted in accordance with the plain meaning of that term.

Alaska Statute 18.80.220 provides in relevant part:

(a) It is unlawful for

(1) an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's race, religion, color or national origin, or because of the person's age, physical or mental disability, sex, marital status, changes in marital status, pregnancy or parenthood when the reasonable demands of the position do not require distinction on the basis of age, physical or mental disability, sex, marital status, changes in marital status, pregnancy or parenthood.

However, AS 18.80.220 does not define the term "marital status." We use our independent judgment to determine what the legislature intended by this term. *Alaska State Comm'n for Human Rights v. State*, 796 P.2d 458, 460 (Alaska 1990) (holding that Commission's interpretation of AS 18.80 is reviewed *de novo* ).

Other jurisdictions that have considered whether prohibiting employment discrimination based on "marital status" precludes discrimination based on the identity of a person's spouse are split. Some courts con-

sidering this issue have construed "marital status" to mean the condition of being married based on the plain meaning of the term. *Maryland Comm'n on Human Relations v. Greenbelt Homes, Inc.*, 300 Md. 75, 475 A.2d 1192 (1984); *Whirlpool Corp. v. Michigan Civil Rights Comm'n*, 425 Mich. 527, 390 N.W.2d 625 (1986); *Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Bd.*, 51 N.Y.2d 506, 434 N.Y.S.2d 961, 415 N.E.2d 950 (1980). Others have construed "marital status" as having a more expansive meaning, in furtherance of perceived legislative intent. *Ross v. Stouffer Hotel Co.*, 72 Haw. 350, 816 P.2d 302 (1991); *River Bend Community Unit Sch. Dist. No. 2 v. Human Rights Comm'n*, 232 Ill.App.3d 838, 173 Ill.Dec. 868, 597 N.E.2d 842 (1992); *Kraft, Inc. v. State*, 284 N.W.2d 386 (Minn.1979); *Thompson v. Board of Trustees*, 192 Mont. 266, 627 P.2d 1229 (1981); *Washington Water Power Co. v. Washington State Human Rights Comm'n*, 91 Wash.2d 62, 586 P.2d 1149 (1978). Many of these decisions are the products of closely divided courts.

### A. *Statutory Interpretation*

In construing the meaning of a statute, we look to the meaning of the language, the legislative history, and the purpose of the statute in question. "The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others." *Tesoro Alaska Petroleum Co. v. State*, 746 P.2d 896, 905 (Alaska 1987). "Because this is a case of first impression in this state, '[o]ur duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.'" *Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d at 1201 (alteration in original) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

### B. *Plain Meaning*

We have rejected a mechanical application of the plain meaning rule in matters of statutory interpretation, and have adopted a sliding scale approach instead. *State v. Alex*, 646 P.2d 203, 208–09 n. 4 (Alaska 1982) (citing *State, Dep't of Natural Resources v. City*

of Haines, 627 P.2d 1047, 1049 n. 6 (Alaska 1981)); see also North Slope Borough v. Sohio Petroleum Corp., 585 P.2d 534, 540 n. 7 (Alaska 1978) ("We reject the so-called 'plain meaning' rule as a strict exclusionary rule."). The plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be. Anchorage Sch. Dist. v. Hale, 857 P.2d 1186, 1189 (Alaska 1993); Alex, 646 P.2d at 208–09 n. 4.

■ In assessing statutory language, "unless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage." Tesoro Alaska, 746 P.2d at 905; Wilson v. Municipality of Anchorage, 669 P.2d 569, 571–72 (Alaska 1983). The most common meaning of "marital status" is the actual condition of being married or unmarried.[3] The term refers only to the state of being married, and does not extend to include the identity of the person to whom one is married.[4] "The relevant inquiry is if one is married rather than to whom one is married." Miller v. C.A. Muer Corp., 420 Mich. 355, 362 N.W.2d 650, 653 (1984).

■ Muller and Relkin contend that if the meaning of "marital status" were "plain," the district court would not have asked us to interpret the term. In one sense this is true. If the term were so plain that it could not reasonably permit the broad construction they urge, that court would have had no reason to refer the issue to us. We do not suggest that the broad construction is altogether unreasonable, only that it stretches the meaning of the term "marital status" beyond the limits of normal usage, which is

the sense in which we use the phrase "plain meaning."

We find that, in accordance with common usage, the plain meaning of the term "marital status" is the condition of being married or unmarried. We will apply this meaning absent convincing evidence of a contrary legislative purpose. Anchorage Sch. Dist., 857 P.2d at 1189.

C. Legislative History

The AHRA was first enacted in 1965. It was amended in 1975 to include a prohibition against discrimination in employment on the basis of marital status or changes in marital status. However, the legislative history of this 1975 amendment contains no discussion of the meaning of "marital status," or of any effect the amendment might have on anti-nepotism laws.

■ The legislature's failure to discuss the specific meaning and effect of the term "marital status" indicates that it did not intend the term to include the identity of one's spouse. "It is assumed that whenever the legislature enacts a provision, it has in mind previous statutes relating to the same subject matter, and all should be construed together." Hafling v. Inlandboatmen's Union of the Pacific, 585 P.2d 870, 877 (Alaska 1978). If the legislature had intended some meaning other than the plain meaning, the 1975 amendment would have merited a discussion of the exact meaning of the term to be applied. Discussion also would have been merited concerning the effect of the amendment on existing statutes, including anti-nepotism laws.

3. "Status" is defined as "the condition (as arising out of age, sex, mental incapacity, crime, alienage, or public station) of a person that determines the nature of his legal personality, his legal capacities, and the nature of the legal relations to the state or to other persons into which he may enter." Webster's Third New International Dictionary (Unabridged) 2230 (1968). Marital status is thus the condition of being married or unmarried, but in the case of married persons, is independent of to whom one is married.

4. Jurisdictions discussing the term agree that it refers only to the state of being married. They define the term in various ways: as "whether one is married or not married," Maryland Comm'n on Human Relations v. Greenbelt Homes, Inc., 300 Md. 75, 475 A.2d 1192, 1196 (1984); as "the social condition enjoyed by an individual by reason of his or her having participated or failed to participate in a marriage," Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Bd., 51 N.Y.2d 506, 434 N.Y.S.2d 961, 964, 415 N.E.2d 950, 953 (1980); and as "that phase of his or her personal lifestyle which is classifiable, for instance, as single, married, separated, divorced or widowed." Id., 434 N.Y.S.2d at 963, 415 N.E.2d at 952.

In *Manhattan Pizza Hut, Inc.*, 434 N.Y.S.2d 961, 415 N.E.2d at 953, the Court of Appeals of New York held that because of the dramatic effect the more expansive definition of "marital status" would have on anti-nepotism policies, the absence of legislative history containing any discussion of what "marital status" includes indicates that the legislature intended that the plain meaning of the term apply. The court found that "[t]he importance of the business and labor management concerns it seeks to serve belies the likelihood that the Legislature would have struck a blow at antinepotism policies with nary a word, in or out of the statute, to express or explain its intention...." *Id.*

Justice Wakatsuki of the Supreme Court of Hawaii agreed with this analysis in his dissent in *Ross v. Stouffer Hotel Co.*, 72 Haw. 350, 816 P.2d 302, 304–05 (1991). In finding that the plain meaning of "marital status" should have been applied, he stated:

> It is also significant that the legislative history of HRS 378–2 omits any mention of the issue before us. A prohibition of discrimination on the basis of identification of one's spouse covers a wide array of personnel policies, including antinepotism policies, policies against hiring the spouse of a major business competitor, and policies against having spouses in supervisor-supervisee capacities. Such policies are widespread and backed by valid reasons.

*Id.*, 816 P.2d at 305 (citing *Manhattan Pizza Hut, Inc.*, 434 N.Y.S.2d 961, 415 N.E.2d at 953).

Anti-nepotism and no-spouse policies have been adopted by many businesses in Alaska. In addition, anti-nepotism statutes prevent certain people from having supervisory positions over each other in the Alaska state government. *See, e.g.*, AS 24.60.090 (relative of legislator may not be employed by house of which legislator is a member while it is in session, or by either house in the interim, and relative of legislative employee may not be employed in a position over which such person has supervisory authority); AS 39.90.020 (unlawful for relative of "executive head of a principal state department or agency to be employed in that department or agency"); AS 14.14.140 (restricting employment by schools of immediate family members of school board members and chief school administrators). We have stated that " '[w]here a reasonable construction of a statute can be adopted which realizes the legislative intent and avoids conflict or inconsistency with another statute this should be done.' " *State v. Patterson*, 740 P.2d 944, 948 (Alaska 1987) (quoting *Gordon v. Burgess Constr. Co.*, 425 P.2d 602, 604 (Alaska 1967)) (alteration in original). Consequently, we find that the lack of discussion in the legislative history supports a conclusion that the legislature intended that "marital status" be interpreted according to its plain meaning.

Muller and Relkin argue that these anti-nepotism laws would not necessarily be invalidated under the more expansive interpretation of the term "marital status," because they would come within the "reasonable demands" exception to AS 18.80.220(a)(1).

This statutory exception provides that employment discrimination on the basis of otherwise forbidden criteria is permissible if "the reasonable demands of the position require" such a distinction to be made. However, this exception is extremely limited. In *McLean v. State*, 583 P.2d 867, 869 (Alaska 1978), we held:

> The only exception to the statutory requirement prohibiting discrimination is that discrimination ... is permitted only "when the reasonable demands of the position" require distinctions [be made]. But this is not an easy escape valve from the anti-discrimination policy of the statute.... The connotation we place on "demands" is that of requirements or necessities that are of an urgent nature.... Without such a connotation, all but the most blatant discriminatory plans would be excused even if they perpetuated the effects of past discrimination.

The state anti-nepotism laws cited above require that an employee not be related to a person with influence over their employment in certain government institutions. Assuming that the legislature did intend the more expansive interpretation of "marital status," the anti-nepotism laws cited would require discrimination based on the identity of one's spouse. Assuming also that the desire to

preserve the appearance and reality of integrity in government institutions constitutes a "reasonable demand" requiring that such a distinction be made, the statutes would fall within the exception to AS 18.80.220(a)(1). *See Washington Water Power Co. v. Washington State Human Rights Comm'n,* 91 Wash.2d 62, 586 P.2d 1149, 1154 (1978) (stating of the Washington state legislature's anti-nepotism statute that "[t]he need for the 'appearance of fairness' in this situation may well outweigh the spouses' interest in obtaining employment unburdened by marital status discrimination"). We consequently assume for the sake of discussion that the statutory exception would avoid the resulting conflict between the anti-nepotism laws and the prohibition against discrimination that would result if "marital status" were given the interpretation Muller and Relkin propose.

However, this would not alter our view of the legislative history. We assume that if the legislature had intended the more expansive meaning of "marital status," it would have recognized and discussed the potential conflict between the 1975 amendment and the anti-nepotism laws and employment practices. Assuming also that the legislature concluded that the statutory "reasonable demands" exception applied, avoiding both the statutory conflict and the invalidation of private employment practices, we nonetheless think it most likely that the legislature would have discussed the conflict and its resolution. Because the legislature engaged in no such discussion, we interpret its silence as an indication that it intended the plain meaning of the term to apply.

### D. *Purpose of the AHRA*

■ In interpreting a statute, we also look to the language of the statute in light of the purposes for which it was enacted. *Tesoro Alaska,* 746 P.2d at 904.

In stating the purpose of AS 18.80, the legislature found

> that discrimination against an inhabitant of the state because of race, religion, color, national origin, age, sex, physical or mental disability, marital status, changes in marital status, pregnancy or parenthood is a matter of public concern and that this discrimination not only threatens the rights and privileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety, and general welfare of the state and its inhabitants.

AS 18.80.200(a). Alaska Statute 18.80 was enacted in order to

> eliminate and prevent discrimination in employment, in credit and financing practices, in places of public accommodation, in the sale, lease, or rental of real property because of race, religion, color, national origin, sex, age, physical or mental disability, marital status, changes in marital status, pregnancy or parenthood.

AS 18.80.200(b).

Muller and Relkin argue that an expansive interpretation of "marital status" is more in keeping with the purposes of the AHRA. They contend that interpreting "marital status" narrowly may lead to results that do not protect married couples from employment discrimination.

■ BP counters that the plain meaning of "marital status" better comports with the purposes of the AHRA. We agree. The purpose of the AHRA is to prevent prejudices and biases borne against persons who are members of certain protected classes; it seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases against the members of those classes.[5] The more expansive interpretation of the

---

5. In interpreting a civil rights statute substantially similar to the AHRA, the Michigan Supreme Court stated:

   Civil rights acts seek to prevent discrimination against a person because of stereotyped impressions about the characteristics of a class to which the person belongs. The Michigan civil rights act is aimed at "the prejudices and biases" borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices and biases.

   *Miller,* 362 N.W.2d at 653–54 (footnote and citations omitted) (interpreting Mich. Comp. Laws. Ann. § 37.3303 (West 1996)). We agree that this is the fundamental purpose of anti-discrimination statutes.

term "marital status" does not protect the members of the class, but instead effectively enlarges it to include all persons wishing to work with their spouses, thus invalidating any relevant anti-nepotism policies.

▮ Anti-nepotism policies exist to prevent "potential emotional interference with job performance, collusion in grievance disputes, favoritism, morale problems resulting from the appearance of favoritism, and conflicts of interests that arise if an employee is required to supervise the employee's spouse." *Miller*, 362 N.W.2d at 654. "Whether these reasons are valid in all circumstances or not, they do not appear to reflect offensive or demeaning stereotypes, prejudices, or biases." *Id.* Therefore, interpreting "marital status" as plaintiffs propose would not advance the AHRA's purpose of protecting class members from prejudices or biases borne against them. *See Whirlpool Corp.*, 390 N.W.2d at 626–27 (holding that the legislative intent behind the Michigan Civil Rights Act was to prevent prejudice against persons based on their membership in a particular class, and to eliminate "the effects of offensive or demeaning stereotypes, prejudices, and biases"; consequently, the no-spouse rule was not discrimination on the basis of marital status, but instead was permissible "different treatment based on the fact that one's spouse works in the same place").

Similarly, we find that the purpose of AS 18.80.220 is to prohibit discrimination against a person based on his or her condition of being married or unmarried, not on the identity of one's spouse. To whom one is married is not a class-defining factor, unlike all the other factors listed in AS 18.80.220(a)(1). Extending the reach of the anti-discrimination law to employment decisions based on to whom a person is married would change the focus of the law from discrimination based on broad categories, which can give rise to demeaning stereotypes and biases, to a highly

individual factor. Thus, adopting Muller's and Relkin's interpretation of "marital status" would be inconsistent with the structure and purpose of the statute, because it would prohibit discrimination based on individual rather than class factors.

We have held that "Alaska's civil rights statute should be broadly construed 'to further the goal of eradication of discrimination.'" *Alaska USA Fed. Credit Union v. Fridriksson*, 642 P.2d 804, 806 (1982) (holding that a nonprofit credit union was an employer for purposes of AS 18.80, and thus subject to the prohibition on sex discrimination) (quoting *Wondzell v. Alaska Wood Products, Inc.*, 601 P.2d 584, 585 (Alaska 1979)). We have also held that "Alaska's anti-discrimination statute gives the [Alaska Human Rights] Commission a more aggressive mandate than that held [under federal law]." *State v. Meyer*, 906 P.2d 1365, 1372 (Alaska 1995). We have long recognized the strong statement of purpose of AS 18.80, and "its avowed determination to protect the civil rights of all Alaska citizens." *Loomis Elec. Protection, Inc. v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976) (holding that compensatory and punitive damages are available as relief under AS 18.80). Accordingly, we conclude that the plain meaning of the term "marital status" achieves the goal of AS 18.80.220 of eradicating discrimination against a person based on the condition of being married or unmarried, and thus best serves the purposes of the AHRA.

### E. *Public Policy*

▮ Muller and Relkin argue that the protection afforded by the expansive interpretation of "marital status" "comports with Alaska's policy of encouraging marriage and family." They also argue that a narrow interpretation will impinge upon an individual's right to choose his or her own marital status unimpaired by improper influences.[6] This

---

**6.** BP argues that anti-nepotism policies like BP's do not "unreasonably or substantially interfere with the right to marry." To support this argument BP cites several federal cases holding that laws prohibiting spouses from working together do not unconstitutionally interfere with the right to marry guaranteed by the First and Fourteenth

Amendments because they do not "directly and substantially" interfere with the right. Although none of the cases cited by BP appears to have considered the possible impact of an anti-nepotism policy on marital decisions in a relatively limited job market, such as that found in Alaska, we assume that the Alaska legislature could have

right is a matter of personal autonomy or freedom, which society has an interest in protecting.

Muller and Relkin contend that the risk of having the choice of marital status impaired by improper influences is particularly strong in Alaska, where the job market is limited and, in some places, dominated by one or a few employers. Muller and Relkin characterize the relevant job market in the narrowest way possible, saying: "plaintiffs had little choice but to be employed by defendant BP on the North Slope of Alaska." If BP strictly enforces its anti-nepotism policy, Muller and Relkin are "left ... with a Hobson's choice of [either] one of them giving up his or her employment, or their [not getting married], and continuing [their romantic relationship] and being employed in their chosen occupation." *Ross*, 816 P.2d at 304; *see also Kraft, Inc.*, 284 N.W.2d at 388; *Manhattan Pizza Hut, Inc.*, 434 N.Y.S.2d 961, 415 N.E.2d at 955 (Cooke, C.J., dissenting).

The state has an interest in protecting a person's right to choose the form that his or her relationships will take. It is for precisely this reason that the AHRA prohibits discrimination on the basis of whether one is married or unmarried. *See Foreman*, 779 P.2d at 1202–03 (holding AHRA prohibits discrimination against unmarried cohabiting individuals). However, the state also has an interest in protecting the interests of its businesses and companies by allowing them to adopt reasonable employment policies. Therefore, although a person's employment

may be affected by the identity of his or her spouse, that effect does not violate the public policy that initially mandated Alaska's anti-discrimination legislation.[7]

## F. *Agency Interpretation*

■ The dissent asserts that the promulgation of 6 Alaska Administrative Code (AAC) 30.990(a)(8) (1995) establishes that the Human Rights Commission interprets the statutory marital status protection to encompass the identity of one's spouse.[8] Dissent at 792–795. The language of the regulation does not clearly support such an interpretation. Given the absence of any legislative history suggesting that the legislature intended the reading Muller proposes, one would expect the agency to more clearly and explicitly define the prohibition to prevent discrimination based on the identity of one's spouse rather than simply refer to "marriage to another person," if that were the reasoning the agency intended. However, even assuming that the language of the regulation does support such an interpretation, the regulation could not justify a statutory interpretation not warranted by the statute's own language and legislative history.[9] Consequently, such an interpretation by the Commission would not be entitled to judicial deference.

## IV. *CONCLUSION*

■ In answer to the certified questions, we hold that AS 18.80.220(a)(1) is limited to

---

expressly and clearly protected the right to marry had it felt the need to do so.

7. Although the parties have understandably focused on anti-nepotism policies, there may be other reasons why an employer might reasonably make employment decisions based on the identity of a person's spouse. A proprietor, for example, might reasonably decline to employ the spouse of a competitor, and a law firm might reasonably decline to hire a lawyer whose spouse works for an institution against which the firm often litigates, or vice versa.

8. 6 AAC 30.990(a)(8) (1995) provides, that as used in AS 18.80,

"discrimination because of marital status or changes in marital status" includes unjustified adverse action taken against a person because that person is single, married, widowed or

divorced, or because of that person's marriage or termination of marriage to another person.

9. Although an agency's statutory interpretation is usually entitled to " 'some weight,' " *Peninsula Marketing Ass'n v. State, Dep't of Fish & Game*, 817 P.2d 917, 922 (Alaska 1991) (quoting *State, Dep't of Revenue v. Alaska Pulp America, Inc.*, 674 P.2d 268, 274 (Alaska 1983)), we "will not defer to an agency interpretation that conflicts with the plain meaning of the statute." *Fairbanks N. Star Borough Sch. Dist. v. NEA–Alaska, Inc.*, 817 P.2d 923, 926 n. 4 (Alaska 1991).

To the extent the agency were promulgating a regulation which differs substantively from the clear language of the statute, it would be invalid. *Powers v. State, Pub. Employees' Retirement Bd.*, 757 P.2d 65, 67 (Alaska 1988) ("regulations made by an agency which exceed its statutory authority are invalid").

preventing employers from discriminating against an employee based on the status of being married, and does not prohibit an employer from discriminating against an employee based on the identity of his or her spouse or future spouse. Thus, we answer "no" to the question whether AS 18.80.220 prevents an employer from discriminating against an employee "based on the identity of his spouse," and "yes" to the question whether AS 18.80.220 is limited to preventing employers from discriminating based on the status of being married.

COMPTON, Chief Justice, dissenting.

In response to a certified question of law from the United States District Court for the District of Alaska, see Alaska R.App. P. 407, the court holds that AS 18.80.220(a)(1), which prohibits discrimination based on, *inter alia,* marital status, "is limited to preventing employers from discriminating against an employee based on the status of being married, and does not prohibit an employer from discriminating against an employee based on the identity of his or her spouse or future spouse." Op. at 793. I think this conclusion runs counter to the letter and spirit of the statute.

I.

The court suggests that the plain meaning of the term "marital status" in AS 18.80.220 dictates the outcome, Op. at 788, and I agree, but the outcome I see the plain meaning producing is quite different from that the court reaches. Pursuant to company policy, any BP employee who supervises a spouse or is supervised by a spouse must be transferred or terminated. BP's policy therefore discriminates based on marital status. When a BP employee is transferred or terminated under the policy, it is the employee's marital status which is the cause of the transfer or termination. If the employee were to divorce or to remain single and cohabit with the supervising or supervised employee, the employee would not be subject to the policy. In other words, marital status is the predicate for the discrimination. The policy violates AS 18.80.220(a)(1).

Given this divergence of opinion, it must be conceded that the meaning of "marital status" is far from plain. The close split among jurisdictions considering the issue is proof enough of this. I am more persuaded by those decisions which hold that statutes banning discrimination based on "marital status" apply to anti-nepotism policies. *See Thompson v. Bd. of Trustees,* 192 Mont. 266, 627 P.2d 1229, 1231 (1981) ("But for the fact this plaintiff is married, he would still be working. The term 'marital status' as a protected classification in the statutes was included to cover this type of unjustified discrimination."); *Kraft, Inc. v. State,* 284 N.W.2d 386, 387 (Minn.1979) ("[A]n antinepotism employment rule denying full time employment to individuals married to persons already employed full time by the employer constitutes a discriminatory practice based on marital status within the meaning of the Minnesota Human Rights Act."); *Washington Water Power Co. v. Washington State Human Rights Comm'n,* 91 Wash.2d 62, 586 P.2d 1149, 1153 (1978) (agreeing with the Washington Human Rights Commission's conclusion that "whether or not it is intended as such, the discharge of an employee or the refusal to hire an applicant because his or her spouse works for the employer necessarily involves an examination of an employee's marital status and therefore is discrimination based upon such status."); *River Bend Sch. Dist. v. Human Rights Comm'n,* 232 Ill.App.3d 838, 173 Ill. Dec. 868, 597 N.E.2d 842, 846 (1992) (School District's anti-nepotism policy "is clearly triggered by a party's marital status and imposes a direct burden upon marriage. A person who remains single would not be affected by the rule.").

II.

In attempting to divine the legislature's intent, the court places emphasis on the legislature's failure to discuss the alleged conflict between the Human Rights Act and anti-nepotism laws governing employment in state government. I am hesitant to draw inferences from the legislature's silence. *See Public Defender Agency v. Superior Court,* 534 P.2d 947, 952 (Alaska 1975) ("Legislative inaction may be evidence of intent, although it is not always a reliable guide."); *Brecht v.*

*Abrahamson,* 507 U.S. 619, 632, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993). "As a general matter, we are 'reluctant to draw inferences from Congress' failure to act.'" (quoting *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 306, 108 S.Ct. 1145, 1154, 99 L.Ed.2d 316 (1988)).[1]

In my opinion, construing AS 18.80.220(a)(1) to apply to anti-nepotism policies gives effect to the legislature's intent. In enacting the Alaska Human Rights Act, the legislature found that discrimination based on marital status "is a matter of public concern and ... not only threatens the rights and privileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety, and general welfare of the state and its inhabitants." AS 18.80.200(a). The purpose of the Act is to prevent such discrimination. *Id.* at .200(b). The narrow interpretation of marital status adopted by the court runs counter to this purpose by forcing those subject to anti-nepotism rules to choose between employment and marriage. *See Kraft, Inc.,* 284 N.W.2d at 388. ("Endorsing a narrow definition of marital status and uncritically upholding an employment policy such as respondent's could discourage similarly situated employees from marrying.... Such an employment policy would thus undermine the preferred status enjoyed by the institution of marriage.") A broad construction of the term marital status avoids this "Hobson's choice" and therefore furthers the purpose of the Act. *See Alaska USA Fed. Credit Union*

*v. Fridriksson,* 642 P.2d 804, 806 (Alaska 1982) (quoting *Wondzell v. Alaska Wood Products, Inc.,* 601 P.2d 584, 585 (Alaska 1979). "Alaska's civil rights statute should be broadly construed 'to further the goal of eradication of discrimination.'").

### III.

The Alaska Human Rights Commission is charged with adopting "procedural and substantive regulations necessary to implement" the Alaska Human Rights Act. AS 18.80.050(a). While the court exercises its independent judgment on issues of statutory construction, the Commission's interpretation is entitled to "'some weight.'" *Peninsula Marketing Ass'n v. State,* 817 P.2d 917, 922 (Alaska 1991) (quoting *State, Dep't of Revenue v. Alaska Pulp America, Inc.,* 674 P.2d 268, 274 (Alaska 1983)).[2]

The Commission has defined discrimination based on marital status to include "unjustified adverse action taken against a person because that person is single, married, widowed or divorced, *or because of that person's marriage or termination of marriage to another person.*" 6 AAC 30.990(a)(8) (emphasis added). In construing statutes or regulations, it is presumed that "every word, sentence, or provision ... [has] some purpose, force, and effect, and that no words or provisions are superfluous." *Rydwell v. Anchorage Sch. Dist.,* 864 P.2d 526, 530–31 (Alaska 1993). The first portion of the Com-

---

**1.** That the legislature has enacted anti-nepotism statutes governing employment in state government sheds no light on the legislature's intent vis-a-vis the Human Rights Act. Different considerations apply when considering whether anti-nepotism rules are proper in the public sector. *See Washington Water Power Co.,* 586 P.2d at 1154 ("The [legislature] is in a different position from the private employer, in that its employees are paid out of public funds over which the legislature exercises control, and it is quite likely that nepotism in the hiring of employees is not looked upon with favor by the public. The need for the 'appearance of fairness' in this situation may well outweigh the spouses' interest in obtaining employment unburdened by marital status discrimination.").

**2.** The court cites *Alaska State Comm'n for Human Rights v. State,* 796 P.2d 458, 460 (Alaska 1990), for the proposition that the court should

exercise its independent judgment in determining the meaning of "marital status." Op. at 788 n. 3. The question presented in *Alaska State Comm'n for Human Rights* was whether the court should review appeals from the Human Rights Commission involving questions of law under the independent judgment standard of review. *Id.* ("We must review appeals involving questions of law from the superior court and the HRC under the same *de novo* standard of review, in order to insure uniformity of decision."). *Alaska State Comm'n for Human Rights* does not undermine the general principle that the court may look to an agency's interpretation to help resolve ambiguous statutory language. *See, e.g., Union Oil Co. of California v. State, Dep't of Revenue,* 560 P.2d 21, 25 (Alaska 1977) ("[T]he statute is ambiguous, and we may therefore give some weight to the administrative decision even when exercising our independent review.").

mission's definition ("adverse action taken against a person because that person is single, married, widowed or divorced") covers what the court calls "the condition of being married or unmarried." Op. at 788. For the second portion of the definition to be more than superfluous, it can only mean that marital status encompasses the identity of one's spouse. BP's policy violates 6 AAC 30.990(a)(8).

### IV.

It is not the case, as the court asserts, that extending the protection of AS 18.80.220(a)(1) to cover the identity of one's spouse will necessarily "invalidat[e] any relevant anti-nepotism policies." Op. at 791. A distinction based on marital status, or on any other protected category, is allowed "when the reasonable demands of the position" require it. AS 18.80.220(a)(1). The Commission has established guidelines for enforcing this provision:

> It is a defense to a complaint of unlawful discrimination to establish by clear and convincing evidence that a distinction in employment prohibited by AS 18.80.220(a)(1) is required by business necessity or the reasonable demands of the position. "Business necessity" or "reasonable demands of the position" means that the distinction is necessary to the safe and efficient operation of the business; the business purpose is sufficiently compelling to override any disproportionate impact on an individual protected by AS 18.80.220(a), and the challenged business practice efficiently carries out the business purpose it is alleged to serve, and there is no available or acceptable policy or practice which would better accomplish the business purpose advanced or accomplish it equally well with less discriminatory impact on the complainant.

6 AAC 30.910(c). This procedure for proving "business necessity" comports with practices in other jurisdictions. *See, e.g., River Bend Sch. Dist.,* 173 Ill.Dec. 868, 597 N.E.2d at 846 (placing the burden on the employer to show that one spouse was unable to effectively supervise another, and noting that the business necessity exception "is a narrow one.");

*Kraft, Inc.,* 284 N.W.2d at 388 ("[O]nly where a business necessity is compelling and overriding may an employer differentiate on the basis of marital status.... Mere business convenience is insufficient."). While the standard is exacting, it nevertheless allows for some exception to the strict anti-discrimination rule in AS 18.80.220(a)(1).

### V.

I would respond to the certified question as follows: AS 18.80.220(a)(1) prevents an employer from discriminating against an employee based on the identity of the employee's spouse, unless the employer can prove that the reasonable demands of the position require a distinction based on marital status.