**UNIVERSITY OF ALASKA, Petitioner,**

v.

**Mark TUMEO and Kate Wattum,
Respondents.**

No. S–6898.

Supreme Court of Alaska.

March 14, 1997.

Thomas P. Owens, Jr. and Patrick J McCabe, Owens & Turner, P.C., Anchorage, for Petitioner.

William B. Schendel, Schendel & Callahan, Fairbanks, for Respondents.

Jeffrey A. Friedman, Friedman, Rubin & White, Anchorage, and Thomas F. Coleman, Spectrum Institute, Los Angeles, CA, for Amicus Curiae Spectrum Institute.

Allison E. Mendel, Mendel & Huntington, Anchorage, and Suzanne Goldberg and Jon Davidson, New York City, for Amici Curiae National Lesbian and Gay Law Association, Lambda Legal Defense and Education Fund, and National Organization for Women Legal Defense & Education Fund.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J., Pro Tem.*

COMPTON, Chief Justice.

## I. INTRODUCTION

■ Two employees of the University of Alaska requested health insurance benefits for their domestic partners; the University denied their requests. The question on review[1] is whether that denial violates AS 18.80.220(a)(1), commonly referred to as the Alaska Human Rights Act, which bars discrimination in employment on the basis of marital status.

## II. FACTS AND PROCEEDINGS

Mark Tumeo and Kate Wattum are employees of the University of Alaska. Neither is married. The University provides employer-subsidized health insurance benefits for its

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. The University filed this case as an appeal of right. *See* Appellate Rule 202(a). However, the superior court had remanded the case to the University for further proceedings, and thus there was no final judgment from which an appeal could be taken. *City and Borough of Juneau v. Thibodeau*, 595 P.2d 626 (Alaska 1979). The lack of a final judgment was noted during consideration of the University's motion for stay of proceedings. Rather than dismissing the appeal under the *Thibodeau* doctrine, this court, *sua sponte*, elected to treat the premature appeal as a petition for review. Appellate Rule 402(a). We granted the petition.

employees and their "dependents." The University defines "dependent," in part, as an employee's "spouse (husband or wife)." In June 1993 Tumeo requested that the University extend health insurance benefits to his domestic partner, Bruce Anders.[2] With his request, Tumeo submitted an Affidavit of Spousal Equivalency signed by him and Anders.[3] Later the same month, Wattum requested health insurance coverage for her domestic partner, Beverly McClendon.[4]

The University denied Tumeo's and Wattum's requests for coverage on the ground that its "health care plan does not allow for coverage of a domestic partner, nor is there any obligation under the plan to provide for such coverage." In accordance with the University's established grievance procedure, Tumeo and Wattum filed multiple grievances contesting the University's denial of benefits. The University denied these grievances. Tumeo and Wattum appealed to the superior court arguing, *inter alia*, that the University's health benefits program discriminates on the basis of marital status in violation of article I, sections 1 and 7 of the Alaska Constitution and AS 18.80.220(a)(1).

The superior court concluded that "[t]he University, by providing added health care coverage for married employees but not for unmarried employees, is compensating married employees to a greater extent than it compensates unmarried employees" and that

"using marital status as a classification for determining which of its employees will receive additional compensation in the form of third-party health coverage ... violates state laws prohibiting marital status discrimination." The court further concluded that "therefore the University's current definition of 'dependent' is unlawful."

The superior court outlined several possible methods by which the University could remedy the unlawful discrimination:

> The University, confronted with a ruling from this court that its current plan violates AS 18.80.220, would have many options. First, it could simply refuse to provide health care coverage for spouses. That is, it could eliminate "spouse" from its definition of "dependent." Second, the University could rewrite its plan to indicate that "dependents" include all persons for whom its employees provide the majority of financial support. The University could adopt Tumeo and Anders' "Affidavit of Spousal Equivalency." The health care plan could be rewritten to indicate that health care coverage would be available for all employees and for employees' domestic partners, provided the employee and the partner were willing to sign an affidavit such as Tumeo and Anders' affidavit.

This court rejected the University's request for a stay pending review. The University then adopted a policy akin to the superior

---

2. Both Tumeo and his partner are male; both Wattum and her partner are female. The parties have argued throughout this litigation that this case involves the benefits provision for unmarried couples generally, and applies with equal force to same-sex and heterosexual couples. We decide only the legal issues raised by the litigants.

3. The affidavit provides in part:
 We[,] Mark A. Tumeo and Bruce W. Anders[,] certify that we are spousal equivalents in accordance with the following criteria and eligible for benefits coverage under the policies of the University of Alaska.
 . . . .
 1. We are each other's sole spousal equivalent and intend to stay so indefinitely.
 2. We are of the same sex and neither one of us is married to anyone else.
 3. We are at least eighteen (18) years of age and mentally competent to consent to contract.

4. We are not related by blood to a degree of closeness that would prohibit legal marriage in the state in which we legally reside.
 5. We reside together in the same residence and intend to do so indefinitely.
 6. We are jointly responsible for each other's common welfare and financial obligations.
 . . . .
 We agree to notify the University of Alaska Benefits Office if there is any change in our status as spousal equivalents as attested to in this Affidavit which would make us no longer eligible for benefits (for example, a change in *joint-residence* or if we are no longer each other's sole spousal equivalent). . . .

4. Wattum did not submit an affidavit. She did offer to supply the University with evidence of the committed nature of her relationship with McClendon. The University did not respond to her offer.

court's third option and extended benefits to employees' domestic partners, provided the employee and partner met certain criteria.

## III. *DISCUSSION*

### A. *The University Admits that It Discriminates on the Basis of Marital Status.*

 The University does not challenge the committed nature of Tumeo's or Wattum's relationship, nor does it challenge the good faith or legal enforceability of Tumeo's and Wattum's financial obligations to their respective partners. The University has conceded that the provision of health insurance benefits to an employee's dependents constitutes "compensation" to the employee as that term is used in AS 18.80.220. The University does not challenge the superior court's finding that the basis upon which it denied the employees' benefits requests was their marital status. Indeed, the University admits that it has discriminated against Tumeo and Wattum on the basis of their mari-

tal status by paying them less compensation than it pays other similarly-situated employees.[5] It argues that such discrimination does not violate the Human Rights Act.[6]

### B. *The Alaska Human Rights Act and Its Recent Amendments*

The Alaska Human Rights Act, AS 18.80.200, provides:

(a) It is determined and declared as a matter of legislative finding that discrimination against an inhabitant of the state because of race, religion, color, national origin, age, sex, physical or mental disability, marital status, changes in marital status, pregnancy, or parenthood is a matter of public concern and that this discrimination not only threatens the rights and privileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety, and general welfare of the state and its inhabitants.

5. In its reply brief the University said:

The University agrees with Tumeo that this denial of benefits to unmarried couples evinces a legislative intent to discriminate against unmarried couples that conflicts with what Tumeo believes to be the plain meaning of the Human Rights Act.

It also said:

Providing unequal benefits because spouses and dependent children are covered, and some employees do not have spouses or dependent children, is blatant discrimination based on marital status and parenthood, and the University has never argued otherwise. Paying somebody who works in Bethel more than somebody who does the same job in Anchorage is also blatant discrimination.

At oral argument the University explicitly stated that it discriminates in the provision of health care benefits to the dependents of University employees on the basis of marital status.

The University's concessions often appear to be made for rhetorical purposes. For example, as noted above, the University says that it is discriminating against childless employees by supplying employees who do have children with health insurance that covers their children. The University does not discuss the meaning of the word "discriminate" as it is used in AS 18.80.220(a)(1). Tumeo and Wattum suggest that discrimination encompasses the "requirement that discrimination victims be 'similarly situated' to others treated more favorably...." In their view they are similarly situated to married couples because they are bound by contract

to support each other. The University argues that Tumeo and Wattum are not similarly situated because the state or medical providers may not assert claims against them for treatment provided to their partners based on their mutual contractual duties, whereas such claims could be asserted against married people. However, the University does not argue that there is no status discrimination based on this distinction.

Given the issues as presented by the University, we have no occasion to attempt to comprehensively define the meaning of the term "discriminate" as used in the statute. We observe, however, that Tumeo and Wattum seem to be correct in suggesting that there is a similarly situated requirement inherent in the concept of discrimination. Based on the University's concession as to the existence of discrimination, however, we have no occasion to determine whether Tumeo and Wattum are in fact similarly situated to married persons with respect to their obligations to their partners.

6. Whether the University's policy violates AS 18.80.220 is a question of statutory interpretation to which the court applies its independent judgment. *Alaska State Comm'n For Human Rights v. State, Dep't of Admin.*, 796 P.2d 458, 459–60 (Alaska 1990); *Wien Air Alaska, Inc. v. Department of Revenue*, 647 P.2d 1087, 1090 (Alaska 1982). On questions of law, the duty of this court is to adopt the rule of law which is most persuasive in light of precedent, reason and policy. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

(b) Therefore, it is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in employment, in credit and financing practices, in places of public accommodation, in the sale, lease, or rental of real property because of race, religion, color, national origin, sex, age, physical or mental disability, marital status, changes in marital status, pregnancy or parenthood....

Alaska Statute 18.80.210 establishes that the opportunity to obtain employment and the other necessities listed in the Human Rights Act without discrimination is a civil right. *See* AS 18.80.210.

Alaska Statute 18.80.220 addresses discriminatory employment practices. At the time this petition was filed it provided:

(a) It is unlawful for

(1) an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's race, religion, color, or national origin, or because of the person's age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood when the reasonable demands of the position do not require distinction on the basis of age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood[.]

The legislature has recently amended the Human Rights Act to permit employers to provide "different retirement and health benefits to certain employees by differentiating between benefits provided to employees with spouses or children and to other employees." Preamble to HB 226. The recent amendments provide in part:

(c) Notwithstanding the prohibition against employment discrimination on the basis of marital status or parenthood under (a) of this section,

(1) an employer may, without violating this chapter, provide greater health and retirement benefits to employees who have a spouse or dependent children than are provided to other employees[.]

AS 18.80.220(c)(1).

### C. The Recent Amendments Do Not Moot Review.

 The recent amendments raise the threshold question of whether the issue in this case is now moot. Generally courts will apply the law as it exists at the time of the decision, not the law existing at the time the case was commenced. *See* 5 Am.Jur.2d *Appellate Review* § 657 (1995); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.6 (2d ed. 1984); *United States Dep't of Justice v. Provenzano*, 469 U.S. 14, 15, 105 S.Ct. 413, 413–14, 83 L.Ed.2d 242 (1984) ("[The issue is] to be judged under the law presently in effect."). Applying this general rule, we conclude that the recent amendments have answered the question presented by this case as far as the employees' claim for prospective relief is concerned.[7]

However, we believe this case retains "its character as a present, live controversy" for two reasons.[8] *See Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1195 (Alaska 1995) ("A claim is moot if it has lost its character as a present, live controversy."). First, the University may seek refunds from Tumeo and Wattum for the payments made to and benefits conferred on them since the superior court's ruling. *See City of Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 372 n. 2, 94 S.Ct. 2291, 2294, 41 L.Ed.2d 132 (1974) (holding that a challenge by parking lot owners to a city parking tax was not mooted by the ordinance's subsequent amendment because tax refunds would be

---

7. The parties appear to agree on this point. The employees acknowledge that "the passage of HB 226 does shift the focus of arguments regarding *prospective* relief away from the construction of the Human Rights Act that formed the basis of the Superior Court's ruling." The University responds that "[t]he issues which remain are purely matters of constitutional interpretation."

8. The parties appear to agree on this point as well. Tumeo and Wattum state "[t]he enactment of HB 226 does not moot this appeal." The University responds "[t]he University agrees with Tumeo that passage of this bill does not automatically make the statutory issue raised in the Petition for Review moot."

due the lot owners if the Court found the challenged ordinance unlawful); *see also* 5 Am.Jur.2d *Appellate Review* § 658 (1985) ("A change in the applicable law will not render moot an appeal challenging that law if . . . refunds must be paid if the old statute is declared invalid.").

Second, the propriety of the superior court's attorney's fees award saves this case from mootness. A superior court acting as a court of appeal from the decision of an administrative agency has the authority under Appellate Rule 508(e) to award attorney's fees to the prevailing party. *See Kenai Peninsula Borough v. Cook Inlet Region, Inc.,* 807 P.2d 487, 501 (Alaska 1991). For this court to determine which party prevailed on the issue argued before the superior court, it must address the merits of the issue under the pre-amendment version of the Human Rights Act. *See LaMoureaux v. Totem Ocean Trailer Express, Inc.,* 651 P.2d 839, 840 n. 1 (Alaska 1982) ("Although we have previously stated that we will not hear a moot case merely to determine who is the prevailing party for purposes of awarding attorney's fees, . . . we believe that the rule announced in those decisions is wrong and those decisions are therefore overruled as to that point.").

### D. *The Discrimination the University Practices Violates the Human Rights Act.*

**1.** *The University bears the burden of showing that the legislature intended to allow the type of discrimination it practices.*

■ The University argues that the discrimination in which it admittedly has engaged is permissible, notwithstanding the clear language of the Human Rights Act, because the legislature did not intend to prohibit such discrimination. It points to several alleged indicators of such a contrary legislative intent and urges the court to reject, on the basis of these arguments, the superior court's "rigid application of the 'plain meaning' rule."

■ It is true that there is no longer a plain meaning rule as such in Alaska law.

Where a statute's meaning appears clear and unambiguous, however, the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent. *Lagos v. City and Borough of Sitka,* 823 P.2d 641, 643 (Alaska 1991); *University of Alaska v. Geistauts,* 666 P.2d 424, 428 n. 5 (Alaska 1983). The clear and unambiguous language of the Human Rights Act forbids discrimination in employment on the basis of marital status.

The University's argument that the legislature nonetheless intended to allow it to engage in this very type of discrimination would be questionable even were it not for our prior decisions on marital status discrimination. It is all the more questionable when considered in the light of the high priority this court has given the Human Rights Act, and the purposes it serves, in those decisions. While our prior decisions on marital status foreordain our conclusion with respect to the merits of the University's argument, nonetheless we are constrained to reiterate both the significance we attach to the Human Rights Act and our reluctance to construe limitations on its power or scope.

■ We consistently have held that the Human Rights Act should be broadly construed to further the goal of eradication of discrimination. *See Thomas v. Anchorage Tel. Util.,* 741 P.2d 618, 629 (Alaska 1987); *Alaska USA Fed. Credit Union v. Fridriksson,* 642 P.2d 804, 806 (Alaska 1982); *McLean v. State,* 583 P.2d 867, 869 (Alaska 1978) ("In view of the strong statement of purpose in enacting AS 18.80, and its avowed determination to protect the civil rights of all Alaska citizens, we believe that the legislature intended to put as many 'teeth' into this law as possible." (quoting *Loomis Elec. Protection, Inc. v. Schaefer,* 549 P.2d 1341, 1343 (Alaska 1976))).

Correspondingly, we have construed the statute strictly against those seeking to utilize or create an exception or limitation of it. *See McLean,* 583 P.2d at 869 ("Since we have held that the legislature intended to put as many 'teeth' into the law as possible, we shall construe the statutory exception strictly against the one who seeks to utilize it."); *see also Simpson v. Alaska State Comm'n for*

*Human Rights,* 423 F.Supp. 552, 555 (D.Alaska 1976), *aff'd* 608 F.2d 1171 (1979) (refusing to provide an upper limit of sixty-five years on age discrimination protection of the Human Rights Act: "It is [ ] against this type of policy that statutes such as Alaska's were enacted and the court will not frustrate the purpose of the statute by adopting an implied interpretation which reflects the state of mind that initially impelled legislative action.").

In the three cases we have decided interpreting the marital status discrimination provision of the Human Rights Act, *Foreman v. Anchorage Equal Rights Comm'n,* 779 P.2d 1199 (Alaska 1989), *Swanner v. Anchorage Equal Rights Comm'n,* 874 P.2d 274 (Alaska 1994), and *Muller v. BP Exploration Inc.,* 923 P.2d 783 (1996), we have given effect to the plain language of the marital status discrimination provisions of the Act.[9]

In *Foreman,* an unmarried mother attempted to rent from the Foremans an apartment for herself, her child, and the child's father. *Foreman,* 779 P.2d at 1200. The Foremans refused to rent to the woman because she and her child's father were not married. *Id.* We held that the Foreman's refusal was illegal:

> We conclude that state and municipal prohibitions against discrimination based on marital status protect the rights of unmarried couples. The Foremans would have rented the apartment to Hohman, Kiefer and the infant had Hohman and Kiefer been married; the Foremans refused to rent the apartment only after they learned that Hohman and Kiefer were not married. This constitutes unlawful discrimination based on marital status.

*Id.* at 1203. In so holding, we rejected Foreman's contention that because cohabitation was a criminal offense at the time the Human Rights Act was amended to include marital status, the marital status provision of the Human Rights Act was not intended to encompass cohabiting couples. *Id.* at 1202.

In *Swanner,* we reaffirmed our decision in *Foreman.* Swanner had refused to rent to several individuals because each individual intended to live with a person of the opposite sex to whom the individual was not married. *Swanner,* 874 P.2d at 276–77. Swanner argued that he was not discriminating on the basis of marital status, but on the basis of conduct, namely cohabitation. *Id.* at 278 n. 4. We rejected Swanner's conduct/status distinction:

> Swanner cannot reasonably claim that he does not rent or show property to cohabiting couples based on their conduct (living together outside of marriage) and not their marital status when their marital status (unmarried) is what makes their conduct immoral in his opinion. The undisputed facts demonstrate that Swanner would have rented to the prospective tenants if they were married. Swanner's argument that he discriminated against the prospective tenants based on their conduct and not their marital status is without merit.

*Id.* at 278 n. 4.

In *Muller,* we upheld a company's anti-nepotism policy. We emphasized that the marital status anti-discrimination clause in AS 18.80.220(a)(1) prevents employers from discriminating based on the marital status of their employees. We concluded that, "in accordance with common usage, the plain meaning of the term 'marital status' is the condition of being married or unmarried." *Id.* at 788. We further concluded that the legislature did not intend the term to include the identity of one's spouse. Thus we held that AS 18.80.220 is applicable only to employers who discriminate based on the status of being married. In adopting this interpretation, we opined that "the plain meaning of the term 'marital status' achieves the goal of ... eradicating discrimination against a person based on the condition of being married or unmarried, and thus best serves the purposes of the [Alaska Human Rights Act]." *Id.* at 791. *Muller*'s holding is relevant to the extent that it reiterates that the type of discrimination the University concedes it practices in its employee benefits policy is not permissible.

---

**9.** The Human Rights Act deals specifically with discrimination in the housing market in AS 18.80.240.

2. *Alaska Statute 14.18.020 does not evince an intent to allow discrimination.*

■ In its opening brief the University argues that, because there is nothing either in "the express statement of purpose of the statute or the legislative history that would indicate the Human Rights Act is meant to apply to employer-provided health care benefits," AS 14.18.020, which was enacted after the Human Rights Act and does specifically mention employee benefits, supersedes the Human Rights Act. Alaska Statute 14.18.020 provides:

The board [of education], the Board of Regents, and each school board in the state shall

(1) allow no difference in conditions of employment, including but not limited to hiring practices, credential requirements, leaves of absence, hours of employment, pay, *employee benefits*, and assignment of instructional and noninstructional duties on the basis of sex or race.... [10]

(Emphasis added.) Another section of chapter 18, AS 14.18.110, provides that chapter 18 "is supplementary and does not supersede existing laws relating to unlawful discrimination based on sex or race." AS 14.18.110. From this, the University argues:

While the legislature decreed that A.S. 14.18 does not supersede existing legislation banning discrimination on the basis of sex and race, it did not decree that it does not supersede existing legislation banning discrimination based on marital status or parenthood. AS 14.18.020 is clear and compelling evidence that the legislature intended anti-discrimination laws applicable to employee benefits to extend only to protection based on sex and race, and *not* on marital status or parenthood.

In its reply brief and at argument, the University disavows its supersession claim. It argues that AS 14.18.020 should control the Human Rights Act, and that the Act should be interpreted "in a way that does not impose marital status provisions on public health insurance plans."

The line of reasoning the University follows leads to the untenable conclusion that it could discriminate in the provision of employee benefits not only on the basis of an employee's marital status, but also on the basis of an employee's age, religion, national origin, or disability, since these characteristics are not specifically protected under AS 14.18.020. We believe the legislature intended AS 14.18 as an expanded measure of protection with an additional remedial option rather than as a limitation of educational employees' civil rights. *See* AS 14.18.100(a) (providing that complaints alleging violations of AS 14.18 can be filed with the Board of Education); 4 AAC 6.510(c) ("In addition to the requirements of AS 14.18 and this section, the requirements of AS 18.80.220 also apply to hiring practices in public education.").

3. *Alaska Statute 39.30.090 does not evince an intent to allow discrimination.*

■ The University claims that the legislature's intent to allow discrimination against unmarried employees with respect to health benefits is shown in the statutes governing the purchase of insurance for state employees. Alaska Statute 39.30.090 provides:

(a) The Department of Administration may obtain a policy or policies of group insurance covering state employees, persons entitled to coverage under AS 14.25.168, AS 22.25.090, AS 39.35.535 or former AS 39.37.145, employees of other participating governmental units, or persons entitled to coverage under AS 23.15.136, subject to the following conditions:

. . . .

(2) Each eligible employee of the state, the spouse and the unmarried children chiefly dependent on the eligible employee for support, and each eligible employee of another participating governmental unit shall be covered by the group policy, un-

---

**10.** As enacted in 1981, AS 14.18.020 barred discrimination only on the basis of sex; it was amended in 1988 to include race.

less exempt under regulations adopted by the commissioner of administration.

Alaska Statute 14.25.168, the section implementing the above provision for the teachers retirement system,[11] provides:

(a) Except as provided in (c) of this section, the following persons are entitled to major medical insurance coverage if a benefit recipient elects coverage under this section:

(1) a person receiving a monthly benefit from the system;

(2) the spouse of a person receiving a monthly benefit from the system;

(3) a natural or adopted child of a person receiving a monthly benefit, if the child is a dependent child as defined in AS 14.25.220.

The University argues that these statutes not only "require the department [of administration] to provide insurance to employees, their spouses, and their dependent children" but "also presumptively prohibit the department from providing insurance to anyone else, such as domestic partners." According to the University, this presumption arises under the "accepted rule of statutory construction that to include specific terms presumptively excludes those which are not enumerated." The University argues that domestic partners are not among those specifically "entitled to" benefits, therefore they cannot receive them without some other grant of authority from the legislature.

The University finds additional support for its argument in AS 14.25.168(c), which disallows insurance coverage to a person receiving payment from the system under a domestic relations order except under certain circumstances.[12] According to the University, this provision makes it "abundantly clear that the list of persons entitled to coverage is meant to be exhaustive. This is because the legislature has seen fit to clarify who is *not* entitled to coverage under this section." [13] The University argues the statutes *"presumptively* exclude from coverage those not enumerated. [They] make it clear that spouses are covered and 'domestic partners' are not. In short, the legislature has *mandated* discrimination in the provision of public employee health insurance benefits on the basis of marital status."

Tumeo and Wattum argue that the statutes the University relies on simply compel certain coverage, without precluding more expansive coverage: "The absence of any express provision for benefits for unmarried couples in the various public employee benefit statutes does not prevent the administrators of those benefits plans from providing the same benefits to unmarried couples." They argue that the University's interpretation of the statutes, even if correct, is not relevant because (1) the University has not purchased an insurance policy pursuant to AS 14.25.168(a), choosing instead to self-insure for the health benefits of its employees,· and (2) the Optional University Retirement

---

**11.** The other implementing provisions listed in AS 39.30.090 contain nearly identical language.

**12.** Alaska Statute 14.25.168(c) provides:

Receipt under a qualified domestic relations order of a monthly benefit from the system does not entitle a person or the person's spouse or child to insurance coverage under (a) of this section. However, a member's former spouse who receives a monthly benefit under a qualified domestic relations order is entitled to receive major medical insurance coverage if the former spouse

(1) elects the coverage within 60 days after the first monthly benefit paid under the order is mailed first class or otherwise delivered; and

(2) pays the premium established by the administrator for the coverage.

**13.** The University finds further support for its argument that the legislature intended to allow marital status discrimination in the provision of health insurance in AS 14.25's definition of "dependent child" as "an *unmarried* child of a member ... who is dependent on the member for support...." AS 14.25.220(13) (emphasis added). From this, the University concludes "that *marital status is a factor expressly and unequivocally written into the eligibility criteria.* ... If the Human Rights Act truly prohibits marital status discrimination in the provision of public employee health insurance, then discrimination between married and unmarried dependent children would be illegal." (emphasis in original). This argument is unpersuasive in the absence of a demonstration that unmarried and married children are similarly situated with respect to dependency.

System of which Tumeo is a member has no spouse-only provision.

Absent some clear expression from the legislature, we are unwilling to conclude that the legislature intended AS 14.18 to limit the objectives of the Human Rights Act when it enacted guidelines for the Department of Administration to follow in obtaining insurance.

### 4. *Other statutes cited by the University provide no guidance.*

The University argues that "[t]he Superior Court's literal reading that the Human Rights Act prohibits all forms of discrimination in employment based upon marital status is also undermined by the fact that the legislature has provided many instances of legal or even mandatory discrimination." The University has appended a chart summarizing 183 statutes which it claims "either allow or require discrimination on the basis of marital status." The argument lacks merit. The statutes cited include the word "spouse," or "husband," or "wife," or "married." They do not refer to marital status discrimination in the areas where the Human Rights Act applies.[14]

### 5. *Silence is inconclusive.*

 According to the University, "[o]ne of the most compelling indicia of the legislative intent with regard to the issue of employer-sponsored health care benefits for spouses and children of employees is the deafening silence that has accompanied the subject for nearly twenty years." In the University's view, the fact that "no agency of any of the three branches of state government has ever interpreted it to apply to public employees health insurance plans" since the adoption of the ban on marital status discrimination is "compelling evidence" that provision should not apply in this arena.

Silence can be evidence of intent; however, it is difficult to decipher what is meant when nothing has been said. *See Brecht v. Abrahamson*, 507 U.S. 619, 632–33, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993) ("As a general matter, we are 'reluctant to draw inferences from Congress' failure to act.'" (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306, 108 S.Ct. 1145, 1153–54, 99 L.Ed.2d 316 (1988))); *Public Defender Agency v. Superior Court*, 534 P.2d 947, 952 (Alaska 1975) ("Legislative inaction may be evidence of intent, although it is not always a reliable guide.").

With respect to the failure of other executive departments to afford health care benefits to unmarried domestic partners of their employees, silence says nothing about what AS 18.80.220(a)(1) may require as executive agencies are not empowered to alter the meaning of a statute. With respect to the inaction of the legislature, we have ruled that a legislature is not institutionally competent to issue opinions as to what a statute passed by an earlier legislature meant. *Hillman v. Nationwide*, 758 P.2d 1248, 1252–53 (Alaska 1988). Here the argument is that subsequent legislatures have by silence expressed their views on what the 1975 legislature (which enacted the bar to marital status discrimination) intended. If a subsequent legislature's actions lack interpretative significance, it follows that its inactions do as well.

## IV. CONCLUSION

The University has admitted that it discriminates on the basis of marital status in the provision of health care benefits. The clear language of the Human Rights Act, before amendment, forbade such discrimination. We conclude that the University has not met its burden of demonstrating a legislative intent contrary to the Act's language. We therefore AFFIRM the decision of the superior court and REMAND the case for

---

**14.** The University argues: "Noteworthy in this chart is the fact that, where the legislature intended a 'family' to consist of more than a legal spouse and children, it specifically said so.... Likewise, had the legislature intended employees' health care benefits to be extended to the modern equivalent of family members, it could have used the same or a similar definition."

This argument is not relevant to the issue at hand. Neither the Human Rights Act, nor AS 14.18.020, nor any other statutory provision cited in the body of the University's brief includes a definition of "family" nor does the interpretation of these provisions turn on the definition of "family."

further proceedings consistent with this opinion.