**William M. TOLIVER II, Appellant,**

v.

**ALASKA STATE COMMISSION FOR HUMAN RIGHTS, Appellee.**

No. S–14232.

Supreme Court of Alaska.

June 29, 2012.

William M. Toliver II, pro se, Anchorage, Appellant.

David T. Jones, Senior Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices, and MATTHEWS, Senior Justice.*

## OPINION

MATTHEWS, Senior Justice.

### I. INTRODUCTION

This appeal presents the question whether the Alaska State Commission for Human Rights (the Commission) must interview one or more witnesses identified by a complainant before dismissing a complaint for lack of substantial evidence to support a discrimination claim. We conclude that the statutory duty to impartially investigate implies that the Commission must make a reasonable effort to interview at least some of the witnesses identified by a complainant where it appears that they may have relevant information. We also conclude that this duty was not satisfied here because the Commission did not interview any of the witnesses identified by the complainant even though they potentially had relevant information.

### II. FACTS AND PROCEEDINGS

#### A. Summary Of Facts

William M. Toliver II is an African–American man in his sixties; he has litigated pro se

---

* Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

throughout these proceedings. During 2007 and 2008, Toliver shopped at two Brown Jug liquor stores—Store 32 and Store 55—located in the Mountain View neighborhood of Anchorage.

On August 21, 2007, Toliver entered Store 32 and was approached by the assistant manager, Crystal Dockter. After a heated verbal exchange of some sort, Dockter "86ed"—banned—Toliver from Store 32. In the store's incident log for that evening, Dockter wrote that she had banned Toliver "for causing problems and for cursing me out." Toliver later disputed this version of events. He continued to shop at Store 55, where he was not banned.

In late June 2008 Toliver called O.C. Madden III, Brown Jug's vice-president for human resources, and complained that Brown Jug was discriminating against him and other members of racial minority groups in Mountain View. Madden and Ed O'Neill—Brown Jug's co-owner—invited Toliver to meet with them in person at their offices. During the meeting Toliver expressed frustration over Dockter's behavior and stated that members of the Mountain View community considered Store 32 to be a "[w]hites only" store.

Madden and O'Neill spoke with their staff in response to Toliver's allegations. They eventually told Toliver that he would be allowed to continue shopping at Store 55 but would be banned from Store 32. Madden and O'Neill also organized a public meeting at a community center to address Toliver's claim that members of the Mountain View community believed Brown Jug employees had racially discriminated against them. Toliver distributed notices of the meeting around Mountain View, which stated:

> Now is the opportunity to verbalize your encounters of racism, disrespect and illegal abuse of the sales clerks and managers' positions at the various stores throughout the [A]nchorage area. [O'Neill and Madden's] sincere objective is to rectify these problems. With our input of ideas let's have an intelligent, constructive and beneficial meeting.

Toliver also circulated a petition in the days leading up to the meeting. In it he referred to his experience of "true disrespect and racism" in a Mountain View Brown Jug store, noted that O'Neil and Madden wanted a meeting to resolve this problem, and asked for signatures from community members who felt they were also victims of "racism, disrespect, etc." At least 24 individuals signed the petition.

The meeting took place on June 30, 2008. Employees from Stores 32 and 55, including Dockter, were in attendance. After the meeting, Madden and O'Neill instructed employees to handle customers respectfully.

At the conclusion of the meeting, the Brown Jug representatives reiterated that Toliver would be allowed to shop at Store 55, but not at Store 32. Immediately after the community meeting, Toliver attempted to purchase alcohol at Store 55. The clerk on duty, who was filling in while the other employees attended the community meeting, was unaware that Toliver was permitted to shop at Store 55 and prevented him from making a purchase.

On three occasions in August 2008, Toliver entered Store 32 and attempted to purchase alcohol. In each instance, a clerk told him he was banned from Store 32 but could shop at Store 55. After the last of these encounters, on August 30, 2008, a clerk recorded an account of the event in the incident log:

> [Toliver] started saying that he had a lawsuit and that he was going to have everyone fired[,] he was calling me racist stupid clerk and that I'm white trash. I told him that he had to leave and called Eric. He [smelled] like he'd already been drinking.

## B. Proceedings

On August 29, 2008, Toliver filed a complaint with the Commission. He alleged that Brown Jug had denied him "rights and privileges as a customer" on the basis of race.

On December 5, 2008, Brown Jug filed a letter with the Commission responding to Toliver's complaint. Brown Jug contended that Toliver's allegations were "meritless" and "unsupported" and that the facts showed "Brown Jug refused service to Toliver at one of its stores after Toliver verbally abused and physically threatened the store's assistant

manager." Brown Jug also pointed out that after meeting with Toliver and listening to his concerns, Brown Jug allowed him to make purchases at a different store in the same area.

After receiving Brown Jug's statement of position the investigator assigned by the Commission to the case called Toliver to review Brown Jug's position statement with him. Toliver denied threatening or cursing at Dockter. Toliver mentioned the manager at Brown Jug Store 55, Richard Senior, as a potential witness, alleging that Senior had told Toliver that he thought what was occurring was wrong. Toliver also stated that the manager at Store 32 "shook his head and said what the heck is going on here." Toliver further stated that the people who had signed the petition were also witnesses.

On December 10, 2008, the investigator wrote to Brown Jug's attorney requesting copies of incident logs and information about, among other things, Brown Jug's policy for denying customer service. She also requested interviews with Dockter, Madden, O'Neill, and the managers of Stores 32 and 55. The investigator did interview Dockter and Madden, but did not interview Senior (the manager of Store 55), nor the manager of Store 32, nor any of the individuals who signed Toliver's petition.

On April 21, 2009, the investigator issued a written determination based on her investigation. She concluded that Toliver was denied the right to shop at Brown Jug Store 32 "because he verbally abused and threatened employees." She observed that customers of other races had been denied service for similar reasons and that the evidence did not show that Toliver was denied service because of his race. The investigator reviewed the determination with Toliver, who vigorously disputed the version of events advanced by Brown Jug and again alleged that Senior had agreed banning Toliver from Store 32 was wrong.

Ultimately, the investigator concluded that Toliver's allegations were "not supported by substantial evidence." On the same day that this report was issued, the executive director of the Commission issued an order closing the case because the "[i]nvestigation did not find substantial evidence to support allegations in the complaint."

Toliver appealed the closing order to the superior court, arguing in part that the investigation was incomplete because the investigator did not interview any of the individuals who signed Toliver's petition. The superior court affirmed the order in a seven-page written decision. The court concluded that it was not necessary for the investigator to interview the petitioners because "the record does not demonstrate that any of the petitioners on the list were present when Toliver's incidents occurred."

## III. STANDARD OF REVIEW

■ "We review de novo questions of law, including the interpretation of a statute, adopting the rule of law most persuasive in light of precedent, reason, and policy."[1]

## IV. DISCUSSION

■ Toliver appeals pro se, and his brief mainly sets out his version of the facts. But we consider pro se pleadings liberally in an effort to determine what legal claims have been raised.[2] Taking that view, we construe Toliver's brief to argue that (1) the Commission staff failed to impartially investigate Toliver's complaint, and (2) the Commission's executive director erred in dismissing the complaint on the grounds that the investigation did not find substantial evidence to support discrimination.

■ As explained below, we conclude that the staff had a duty to conduct an impartial investigation before dismissing Toliver's complaint for lack of substantial evidence and that it failed to comply with this duty. These conclusions make it unnecessary to decide whether the investigation uncovered substantial evidence of discrimination. Following the additional investigation after remand the

1. *Alaskans For Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004).

2. *See Clemensen v. Providence Alaska Med. Ctr.*, 203 P.3d 1148, 1150 (Alaska 2009) (construing pro se litigant's complaint to raise four distinct causes of action).

record may change, or the executive director may decide that substantial evidence of discrimination has been discovered and proceed with conciliation or a hearing, or the executive director may decide to close the case on other grounds.[3] Any of these occurrences would moot the substantial evidence argument as it is currently presented.

### A. The Commission's Duty To Conduct An Impartial Investigation Requires A Reasonable Effort To Interview Some Of A Complainant's Witnesses.

The investigatory duties of the Commission[4] are set out in the first sentence of AS 18.80.110: "The executive director or a member of the commission's staff designated by the executive director shall informally investigate the matters set out in a filed complaint, promptly and impartially." This language explicitly requires that the Commission conduct an impartial investigation of each complaint.

■ The investigation serves as the basis for further agency action. Thus if the investigation discovers substantial evidence of discrimination the investigator is required to eliminate or remedy it "by conference, conciliation and persuasion."[5] If that process fails, the executive director may decide to issue an accusation which initiates the hearing process before the Commission.[6] But without an impartial investigation there is a risk that even if substantial evidence of discrimination exists, it will not be discovered and the case will be closed without conciliation or a hearing.[7]

The policies and purposes of the Human Rights Act[8] are set out in AS 18.80.200(a)-(b):

> (a) It is determined and declared as a matter of legislative finding that discrimination against an inhabitant of the state because of race, religion, color, national origin, age, sex, physical or mental disability, marital status, changes in marital status, pregnancy, or parenthood is a matter of public concern and that this discrimination not only threatens the rights and priv-

---

**3.** In *State, Department of Fish & Game, Sport Fish Division v. Meyer,* 906 P.2d 1365, 1373–74 (Alaska 1995), we held that Commission closing orders are subject to judicial review. When *Meyer* was decided complaints could be dismissed after an investigation but before a hearing for lack of substantial evidence, but not for prudential or policy reasons. *Id.* at 1373. After *Meyer* was decided, the legislature enacted AS 18.80.112(b) to give the executive director discretion to dismiss a complaint for a number of reasons in addition to the lack of substantial evidence. Ch. 63, § 4, 2006 SLA. These reasons include that the complainant has indicated an intent to bring an action based on the same facts in another forum, that the hearing will not represent the best use of Commission resources or advance the purposes of eliminating or preventing discrimination, or that the probability of success of the complaint on the merits is low. AS 18.80.112(b). In this case the executive director did not dismiss the complaint based on any of these reasons; the dismissal was based on the lack of substantial evidence. Such dismissals remain reviewable in accordance with *Meyer.*

**4.** Our use of the term "Commission" here refers to the State Commission for Human Rights collectively and includes action by the executive director of the Commission and the Commission staff.

**5.** AS 18.80.110 provides in full:

> The executive director or a member of the commission's staff designated by the executive director shall informally investigate the matters set out in a filed complaint, promptly and impartially. If the investigator determines that there is substantial evidence of an unlawful discriminatory practice under this chapter, the investigator shall immediately try to eliminate or remedy the discriminatory practice through an agreement reached by conference, conciliation, and persuasion. If an agreement is reached, it must be reduced to writing and signed by the complainant, executive director, and respondent. The agreement is binding and enforceable under this chapter as an order of the commission. An agreement reached under this section may include the compromise of damages authorized under this chapter.

**6.** AS 18.80.120(a).

**7.** *See Grundberg v. Alaska State Comm'n for Human Rights,* 276 P.3d 443, 451 (Alaska 2012) ("During the investigative phase, the Commission is charged with 'impartially' reviewing the allegations, but an employee seeking to rebut an employer's alleged non-discriminatory reason may have to rely on the Commission to investigate her expressed suspicions....").

**8.** We use the term "Human Rights Act" to refer to AS 18.80.

ileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety, and general welfare of the state and its inhabitants.

(b) Therefore, it is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in employment, in credit and financing practices, in places of public accommodation, in the sale, lease, or rental of real property because of race, religion, color, national origin, sex, age, physical or mental disability, marital status, changes in marital status, pregnancy or parenthood. It is also the policy of the state to encourage and enable physically and mentally disabled persons to participate fully in the social and economic life of the state and to engage in remunerative employment. It is not the purpose of this chapter to supersede laws pertaining to child labor, the age of majority, or other age restrictions or requirements.

■ Because of this strong statement of policy we have consistently construed the Human Rights Act broadly "to further the goal of eradication of discrimination."[9] We have also noted that, in view of this strong statement and the legislature's avowed determination to protect the civil rights of all Alaskans, "we believe that the legislature intended to put as many 'teeth' into this law as possible."[10] In light of these observations it would be anomalous to hold that the "investigate impartially" language of section .110 does not require that a reasonable effort be made to interview witnesses identified by a complainant who may have relevant information. Without such an investigation, a Commission determination that a complaint

is not supported by substantial evidence could be meaningless. Accordingly, we conclude that a reasonable effort must be made to interview at least some of a complainant's witnesses who appear to be possessed of relevant information.

Courts in New York, which has a statutory human rights system very similar to Alaska's, have reached a similar conclusion. The New York Human Rights Division is required to make a "prompt and fair investigation" of each complaint filed before it,[11] language almost identical to that found in AS 18.80.110. New York courts have interpreted this provision to establish an affirmative investigative duty on the part of the division, the breach of which is subject to judicial review.[12] Appellate decisions have elaborated that a dismissal for lack of probable cause is improper if "based upon an investigation which was abbreviated and one-sided and resulted in a record which did not afford a reasonable basis for an administration determination."[13] Pertinently, one New York court, after considering the division's failure to "examine witnesses crucial to the complainant's case," reversed the agency's determination of no probable cause.[14]

### B. The Investigation Of Toliver's Complaint Was Not Impartial.

Here, the Commission's investigation consisted of an intake interview with Toliver, interviews with Dockter and Madden, and a few telephone conversations with Toliver that he initiated. Significantly, the investigator did not interview any of the individuals who, according to Toliver, would corroborate his claim of discrimination.

**9.** *Muller v. BP Exploration, Inc.*, 923 P.2d 783, 791 (Alaska 1996) (quoting *Alaska USA Fed. Credit Union v. Fridriksson*, 642 P.2d 804, 806 (Alaska 1982)).

**10.** *McLean v. State*, 583 P.2d 867, 869 (Alaska 1978) (quoting *Loomis Elect. Protection, Inc. v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976)).

**11.** N.Y. Comp.Codes R. & Regs tit. 9, § 465.6(a) (2012).

**12.** *See, e.g., Belgrave v. State Div. of Human Rights*, 68 A.D.2d 922, 414 N.Y.S.2d 377 (N.Y.A.D.1979) (remanding to division for hear-

ing when investigation was incomplete and did not allow complainant full opportunity to present contentions and evidence).

**13.** *Tenenbaum v. State Div. of Human Rights*, 50 A.D.2d 257, 259, 376 N.Y.S.2d 542 (N.Y.A.D. 1975); *see also Belgrave*, 68 A.D.2d at 922, 414 N.Y.S.2d 377 (quoting *Tenenbaum*).

**14.** *Pape–Becker v. Equitable Life Assurance Soc'y of the U.S.*, 111 A.D.2d 427, 428, 488 N.Y.S.2d 321 (N.Y.A.D.1985).

The investigator did ask Toliver to provide the names of specific individuals who had witnessed the alleged discrimination taking place. Toliver claimed at oral argument before the superior court that he provided the investigator with the names of three individuals, but the agency record does not corroborate this claim. Even without these specific names, however, it would have taken little effort for the investigator to contact at least a few of the 24 individuals who signed the petition and provided telephone numbers.[15]

Further, it is unclear why the investigator retreated from her stated intention to interview the managers of Stores 55 and 32. Her failure to interview Senior—the manager of Store 55—is particularly troubling. Toliver alleged that Senior had agreed that Brown Jug's actions were racially motivated. If verified, Senior's agreement would mark him as a witness who has potentially relevant information. We conclude, therefore, that as a result of its failure to make an effort to interview at least some of the witnesses identified by Toliver, the Commission breached its duty to conduct an impartial investigation.

 The Commission's regulations authorize it to "determine the nature and scope" of each investigation.[16] We agree that this authority is properly committed to agency discretion subject only to review for abuse of discretion. We do not require by this decision that the Commission interview all alleged witnesses to discrimination, nor do we substantially restrict the Commission's ability to guide its own investigations. We merely hold that the Commission abuses its discretion when it interviews witnesses who can be expected to be favorable to the respondent but makes no effort to interview any witnesses listed by the complainant. In such a case the Commission may not dismiss a complaint for lack of substantial evidence because an investigation which is "abbreviated and one-sided" does not supply a reasonable basis for making such a determination.[17]

## V. CONCLUSION

We REVERSE the decision of the superior court and REMAND this case to the superior court for REMAND to the Commission with instructions to fulfill its duty to complete an impartial investigation and to take further appropriate action. We do not retain jurisdiction.

---

**15.** Even though these witnesses may not have been present when the incidents concerning Toliver occurred, they still could have information about other discriminatory incidents or practices that would be relevant to Toliver's claims. *See, e.g., Parker v. Secretary, U.S. Dep't of Hous. & Urban Dev.*, 891 F.2d 316, 322–23 (D.C.Cir.1989) (holding witness testimony establishing "discriminatory atmosphere" relevant "as circumstantial evidence of individualized discrimination").

**16.** 6 Alaska Administrative Code (AAC) 30.320(a) (2007).

**17.** *Tenenbaum*, 50 A.D.2d at 259, 376 N.Y.S.2d 542; *see also Belgrave*, 68 A.D.2d at 922, 414 N.Y.S.2d 377 (quoting *Tenenbaum* ).